SILVER KING COALITION MINES CO. v. CONKLING MINING CO.*

CONKLING MINING CO. v. SILVER KING COALITION MINES CO.

(Circuit Court of Appeals, Eighth Circuit. December 19, 1919.)

Nos. 5188, 5190.

1. TENANCY IN COMMON ⊜〰22—MINING CLAIM—MINING BY ONE COTENANT—ACCOUNTING.

A tenant in common of a mining claim, which extracts and sells ore therefrom, holds the share of its cotenant in trust, and it is its duty to notify the cotenant, to keep the ore separate, and to keep an account of its proceeds, and where, because of its violation of such duty, the amount and value of the ore cannot be accurately ascertained, all doubtful question should be resolved against it on an accounting.

2. APPEAL AND ERROR ⊜〰1011(1)—REVIEW—FINDINGS OF FACT.

Findings of the trial court on an accounting by a tenant in common of a mining claim to its cotenant for ore extracted and sold from the claim, as to quantity and value of the ore, made on conflicting evidence, sustained.

3. TENANCY IN COMMON ⊜〰22—MINING CLAIM—MINING BY ONE COTENANT—ACCOUNTING.

A cotenant of a mining claim, which secretly extracted and sold ore therefrom, on an accounting to its cotenant, held not entitled to an allowance, as an expense of extraction, of the cost of cleaning and extending a tunnel, which, although indirectly the means of discovering the ore, was used by it for other purposes, and produced an income exceeding such cost.

4. TENANCY IN COMMON ⊜〰22—MINING CLAIM—MINING BY ONE COTENANT—ACCOUNTING.

A cotenant in exclusive possession of mining property, who extracts and sells the ore, may charge against its proceeds the reasonable and necessary expense of its extraction and marketing.

Appeal from the District Court of the United States for the District of Utah; Tillman D. Johnson, Judge.

Suit in equity by the Conkling Mining Company against the Silver King Coalition Mines Company. Decree for complainant, and both parties appeal. Modified and affirmed.

See, also, 230 Fed. 553, 144 C. C. A. 607.

T. Marioneaux and W. H. Dickson, both of Salt Lake City, Utah (A. C. Ellis, Jr., and R. G. Lucas, both of Salt Lake City, Utah, on the brief), for Silver King Coalition Mines Co.

Edward B. Critchlow, of Salt Lake City, Utah (William W. Ray, of Salt Lake City, Utah, William D. McHugh, of Omaha, Neb., and William J. Barrette and William H. King, both of Salt Lake City, Utah, on the brief), for Conkling Mining Co.

⊜〰For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied May 29, 1919.

Before SANBORN and STONE, Circuit Judges, and ELLIOTT, District Judge.

SANBORN, Circuit Judge. The decree assailed by these appeals is that the plaintiff below, the Conkling Company, a corporation, recover of the defendant below, the Silver King Coalition Mines Company, a corporation, $542,222.58, on account of the latter's extraction and appropriation to its own use, of the plaintiff's share of the ore in the Conkling lode mining claim, which the two corporations owned as tenants in common. Prior to the year 1907 Nicholas Treweek and J. Leonard Burch were the owners of an undivided three-fourths, and the Kearns-Keith Company, a corporation, was the owner of the undivided one-fourth, of this lode mining claim. In that year Treweek and Burch conveyed their three-fourths and their causes of action against the Kearns-Keith Company and the King Company to the Conkling Company, and the King Company succeeded to the ownership of the Kearns-Keith Company's one-fourth and assumed its liabilities, so that the Conkling Company and the King Company stand in the same relation to each other as if each had owned the interest, and had committed the acts of omission and commission of their predecessors or predecessor in interest. For the sake of brevity, therefore, the acts of omission and commission of their respective predecessors will in this discussion be called their acts respectively.

The King Company first discovered ore in this claim in October or November, 1906. It had then long been in exclusive possession of that claim. It had run the Alliance Tunnel and numerous drifts and crosscuts therefrom through its own land through the Conkling and other claims to enable it to reach and work ores wherever it might find them. As it was driving one of these crosscuts through the ground of the Conkling claim it discovered in that ground the ore in controversy. It did not notify its cotenant of its discovery, but during the year 1907 it took out from Conkling ground and stored in drifts underground many thousand tons of ore. In the latter part of 1907 the Conkling Company learned something of this operation and in December of that year and January, 1908, it demanded access to and an opportunity to examine the defendant's workings in Conkling ground, that the ore taken therefrom should be kept separate from ores from other sources, and that the King Company should account to it for three-fourths of that ore. The King Company did not grant these requests. This suit was commenced on January 8, 1908, and after an application was made herein therefor, an order was made by the court on June 30, 1908, with the consent of the King Company, that the Conkling Company should have access to the workings of the latter in Conkling ground and an opportunity to examine and survey them. The King Company, however, continued to extract the ore from this mine, a part of which proved to be within, and a part of which proved to be without the Conkling ground. From May, 1907, to August, 1910, and during the years 1913, 1914, 1915, and 1916 it did not keep the ore from Conkling ground separate from that outside that ground, but mingled the ores together. After April, 1909,

the ore from the Conkling ground and from adjacent ground was hoisted by the King Company from the 500-foot level through the Silver Hill shaft, and the shift bosses kept a record of the number of cars of first class ore and of the number of cars of second class ore that were hoisted through that shaft. But no account of the amount of the ore taken from the Conkling ground, or of its value or of its proceeds, was kept by the King Company. The result was that when, under the interlocutory decree, it became necessary to determine the the amount and value of this ore in 1917, the Conkling Company was dependent for its information on the testimony of officers and employés and the scant records of a corporation which had not informed it of the discovery of the ore, had not permitted it to examine its workings in Conkling ground until induced to do so by a suit and an application for an order, had refused to keep an account of the volume of ore it took from Conkling ground, or of its value or proceeds, and had never rendered any account thereof until it presented one showing the amount due the Conkling Company to be $78,638.61 in obedience to the interlocutory decree in the spring of 1917 preparatory to the final hearing. The claim of the Conkling Company was for about $900,-000. The decree of the court was for $542,222.58, and the question raised by the assignments of error of the respective parties is the correctness of this amount which the King Company contends is too large and the Conkling Company insists is too small. The title and the respective rights of the parties to the Conkling lode mining claim, especially to the 135-foot strip across its westerly end were adjudged by this court in 1916 in this suit (Conkling Mining Co. v. Silver King Mines Co., 230 Fed. 553, 144 C. C. A. 607), a motion for rehearing was considered and denied, an application to the Supreme Court for a writ of certiorari failed (242 U. S. 629, 37 Sup. Ct. 14, 61 L. Ed. 536), and this court is unwilling now, if it might lawfully do so, to disturb that adjudication.

[1] Turning, then, to the finding of the court below relative to the amount of the recovery, the indisputable fact is that many of the issues that conditioned the bases of the accounting were determinable only from conflicting testimony, or from indirect evidence and the rational deductions therefrom, or from scant and unsatisfactory proof, so that after a study of the record the truth of the statement of the court below in opening its opinion on the accounting that "the record in this matter is voluminous, but in many respects unsatisfactory, and the best that can be hoped for is an approximation of a true account between the parties," is conclusively demonstrated.

In this state of the case the rules and legal presumptions, by which this court should be guided in its consideration of the evidence and its review of the findings below, are of more than ordinary importance. Counsel have recognized this fact, and their forcible and exhaustive arguments upon this subject have been thoughtfully considered with this result. As this court stated in Silver King Coalition Mines Co. of Nevada v. Silver King Consolidated Mining Co. of Utah, 204 Fed. 166, 180, 122 C. C. A. 402, 416, the King Company—

"was a trustee for the complainant of its share of the ore it took, and of the proceeds thereof. As such trustee it violated its duty to notify its cotenant of its entry and taking of the ore, its duty to keep the ore separate, its duty to keep an account of it and of its proceeds, and its duty, promptly to account for and pay to its cotenant its just share of the proceeds of the ore."

If the King Company had discharged these duties, the amount that should be recovered could have been readily ascertained and clearly proved. So uncertain did its failure so to do render the amount it ought to pay in its own estimation that it filed four accounts in this suit, in which the amounts it stated its indebtedness to the Conkling Company varied from $72,750.76 to $262,161.22. In a suit of this nature the burden is upon the plaintiff to prove that the defendant took the plaintiff's ore, or the proceeds of it, and mingled it with the ore in which the plaintiff had no interest, and those facts were admitted or conclusively proved in this case. Then the burden of proof and the duty rested upon the defendant to prove the amount of the ore it took from Conkling ground and its proceeds or value, and to account and pay therefor, and if by reason of the failure of the defendant to keep the Conkling ore separate from other ore, and to keep an account of the ore taken and of its proceeds or value, the proof of the amount, the proceeds or value, or of any other facts requisite to make such proof, remained at the close of the hearing evenly balanced, uncertain, or doubtful, the doubt should have been and should now be so resolved, in accordance with the basic principle of the accounting of a negligent or reckless trustee or agent, that the latter shall receive no profits from his wrongful treatment of the property of his cestui que trust, and the latter shall receive the just value of his property and its income. The King Company should not profit in this case by its own wrong, and issues rendered uncertain or doubtful by reason of its failure to discharge its recited duties, or by its confusion of the ores from Conkling ground with those from other sources, must be resolved against it. By that rule, therefore, and by the familiar rule that, where a court has considered conflicting evidence and made a finding or decree, the presumption is that it is correct, and unless some obvious error of law has intervened, or some serious mistake of fact has been made, the finding or decree must be permitted to stand (Coder v. Arts, 152 Fed. 943, 946, 82 C. C. A. 91, 94, 15 L. R. A. [N. S.] 372), this court must be guided in its review of the findings and decree below in this case.

[2] As, when this case came to a hearing, there was no account or record of the volume of ore taken from Conkling ground between May, 1907, and May, 1909, and as the only account or record of the ore taken therefrom after April, 1909, was the shift bosses' record of the amount of ore coming both from within and without Conkling ground that was hoisted from the 500-foot level through the Silver Hill shaft, and as that record failed to show what part of that ore came from within or from without the Conkling claim, the most available method of finding the volume of ore taken from that ground was to ascertain the extent of the cavity therein made by the King Company, and then to estimate from such facts as could be proved from the recollection

and testimony of witnesses and from surveys, the number of tons of first-class or shipping ore and the number of tons of second-class or milling ore the cavity originally contained, for every part of the cavity contained ore of each class, and there was a difference of several dollars per ton in the value of the two classes.

Mr. C. P. Brooks, a mining engineer, had been the engineer of the King Company during its workings, and had made surveys from time to time as the work in the Conkling progressed through the various stopes, drifts, and crosscuts therein, some of which were partly within and partly without the Conkling claim. The King Company, to support the account it had rendered, called and examined Mr. Brooks at length. His testimony was that the total cavity within Conkling ground was 302,173 cubic feet, and on that basis the accounting has been taken by counsel and the court. Mr. Brooks also testified to the number of cubic feet in the various cavities in the numerous stopes, drifts, levels, etc., which formed parts of the entire cavity. Having the cubic feet in the cavity or any part of it, it was necessary, in order to estimate the number of tons of each class of ore that had been taken therefrom, to ascertain or estimate what part of the material therein was ore, and what part, if any was waste, how many cubic feet of the first-class ore that had been in that cavity made a ton, and how many cubic feet of the second-class ore from that cavity made a ton, and also the proportion of the first-class ore to the second-class ore therein. The evidence in answer to each of these questions was in hopeless conflict. Upon a consideration of all of it, the court reached the conclusion that it required 6 cubic feet of first-class ore taken from the Conkling ground to make a ton, and 7.62 cubic feet of the second-class ore to make a ton, and upon that basis the decree rests.

The King Company earnestly contends that this finding was erroneous, and that the decree should be reformed upon the basis of 7.275 cubic feet per ton of first-class ore and 9.315 cubic feet per ton of second-class ore. The evidence upon this issue is so voluminous that only a bare outline of its nature is permissible here. The King Company made its first and second accounts in this case on the basis of 9 cubic feet per ton of first-class ore and 11 cubic feet per ton of second-class ore. It made its third and fourth accounts on the basis of 7.275 cubic feet per ton of first-class ore, and its fifth account on the basis of 7.275 cubic feet per ton of first-class ore and 9.315 cubic feet per ton of second-class ore. Mr. Brooks was its chief witness. He testified that he took from the sides of the cavity, after the ore in question was removed, five samples that he thought fairly represented the extracted ore, that he had them assayed by Mr. Hansen, who had been the assayer of the Silver King Company since 1914, that he put his sample No. 1, which weighed 74½ pounds, in a box, packed wheat around and over it, leveled the wheat with the top of the box, then took the sample out and measured the space between the top of the box and the wheat remaining to obtain the cubic contents of the sample; that he treated his samples 2, 3, 4, and 5 in the same way; that he weighed each of the samples; that all the samples except No. 5 proved, when assayed, to be first-class ore, although he

picked one of the four for second-class ore; that he ascertained from the data he had thus obtained and the cubic feet in the various cavities, that sample No. 1 ran 7.07 cubic feet of first-class ore per ton, sample No. 2, 8.37 cubic feet per ton, sample No. 3, 8.58 cubic feet per ton, and sample No. 4, 9.72 cubic feet per ton; that the average number of cubic feet required to make a ton of first-class ore according to these samples was 8.44; and that it required 11.17 cubic feet of second-class ore like sample No. 5 to make a ton. Two scientific experts, took these samples and a sample called No. 6, taken from the cavity by one of the defendant's witnesses, or suitable specimens of them, pursuant to the agreement of the parties, and ascertained and reported to the court the specific gravity of each and the number of cubic feet of ore requisite to make a ton of each. They reported it required 6.5 cubic feet of first-class ore to make a ton like sample No. 1, 7.7 cubic feet to make a ton like sample No. 2, 7.1 cubic feet to make a ton like sample No. 3, 7.8 cubic feet to make a ton like sample No. 4, and 5.2 cubic feet to make a ton of ore like sample No. 6, an average of 6.86 cubic feet of first-class ore to a ton, and that it would require 10.3 cubic feet of second-class ore to make a ton like sample No. 5.

After the King Company had introduced the testimony of Mr. Brooks and its other witnesses, Harry D. Taylor was called as a witness by the Conkling Company. He testified that he was a mining engineer, a graduate of the Colorado State School of Mines in 1900, that he had so thoroughly examined the testimony and figures of Mr. Brooks, Mr. Humes, and other evidence introduced by the King Company that he could arrive at the cubical contents of a ton of first-class ore taken from the Conkling claim and at the cubical contents of a ton of second-class ore taken therefrom, and that he had estimated to his entire satisfaction that the number of cubic feet of first-class ore extracted by the King Company required to make a ton was 6, and that the number of cubic feet of second-class ore was 7.62; that he reached this conclusion by a process of elimination and calculation detailed in his testimony, founded upon the testimony of Mr. Brooks that the total number of cubic feet of material extracted from the 600 stopes in 1914, 1915, and 1916 was 183,523, and upon the number of tons extracted given in the cost analysis sheet, which was, generally speaking, treated by both parties upon the trial as correct. By this method he found that 1,777.10 tons of first-class ore and 19,238.51 tons of second-class ore were taken from the Alliance side of the 600 stopes in 1914, 1915, and 1916. He then subtracted from the 183,523 cubic feet one-seventh, the average of the figures of Mr. O'Neill, a witness for the King Company, for waste, leaving 157,305 cubic feet in the cavity of the 600 stopes that must have been occupied by ore, and found that by allowing 6 cubic feet of first-class ore to the ton, and 7.62 cubic feet of second-class ore to the ton, the 1,777.10 tons of first-class ore and the 19,238.51 tons of second-class ore would fill 157,295 of the 157,305 cubic feet therein.

Counsel for the King Company, after describing Mr. Taylor's method, write in their brief, "There is nothing faulty about Mr. Taylor's

mathematics here, but the 600 stopes must be taken to mean all the stopes on the Alliance side below the 500-foot level," and they insist that his conclusions are not only inaccurate, but without probative force, because neither he nor Mr. Brooks included in the 183,523 cubic feet of cavity the space in the 700-foot drift stope, 3,402 cubic feet, in the 704-foot drift through ore, 3,430 cubic feet, in the 700-foot level drift through ore, 9.030 cubic feet, or in the 707-raise stope, 1,090 feet. In support of this contention counsel present a persuasive array of evidence and argument. It is, however, difficult to believe that Mr. Brooks was either ignorant of the facts or in error in his testimony on this subject. He was the engineer of the King Company, familiar with its doings and with the mining property, more familiar than any other witness in the case. He testified in much detail regarding the 600 stopes—that is to say, the stopes below the 500-foot level from which ore came out of the Conkling through the place where the tonnage was recorded in 1914, 1915, and 1916; that the total cavity therein contained 183,523 cubic feet, and that there were no other stopes the material of which came out through the 600 level during those years. This testimony of Mr. Taylor and Mr. Brooks formed a substantial basis, if true, as counsel conceded, for clear proof of the number of cubic feet of ore of each class in the Conkling claim required to make a ton. There was no suggestion by that company in the examination of Brooks or Taylor that the testimony as to the number of tons or as to the number of cubic feet in the 600 stope was either false or inaccurate. Taylor took the number given by Brooks, made his proof on that basis, and now the King Company insists it is no proof, because its witness was mistaken and the testimony he gave was erroneous.

The evidence shows that some of the stopes below the 500 level were called by different names at different times, but that the term "600 stopes" was often, but not always, used to denote all the stopes on the Alliance side below the 500 level; that the King Company and Mr. Brooks probably knew more of the facts in this case than Mr. Taylor and the Conkling Company; and that the latter had reason to rely upon his evidence. Each party has been able to present evidence that its opponent's basis, when applied under assumptions it makes to a specific stope it selects, demonstrates its erroneous character. There is much evidence on the subject under consideration that has not been recited. The evidence for 9.315 cubic feet per ton of second-class ore is not convincing. Perhaps its best support is the single sample of second-class ore taken from the exhausted cavity by Brooks, which according to his testimony required 11.17 cubic feet per ton, and according to the two selected experts 10.3 cubic feet per ton. Brooks himself testified that the taking of this single sample of second-class ore and inferring from it that all the second-class ore in the mine required the same number of cubic feet as this sample to make a ton was not the proper way of arriving at the desired result, and that he had intended to get and thought he had taken more samples of the second-class ore, but when they were assayed all he had taken, except this one, proved to be first-class. This mistake in his selection rather in-

dicates that consciously or unconsciously he underestimated the grade and value of the Conkling ore. So improbable was his deduction from his sample and from his experiments on this subject that the second-class ore ran 11.17 cubic feet per ton, that the court and both parties to the suit refused before the final argument below to follow it.

His conclusion from the samples of first-class ore that 8.44 cubic feet of the first-class ore were required to make a ton was also discarded by all parties. The King Company now claims only 7.275 cubic feet. The average derived from the number of cubic feet found by the two experts from the five samples submitted to them was 6.86 feet, and the court below found 6. There was a large amount of evidence as to the class and character of this ore from witnesses who had seen it or seen the samples of it remaining in the cavity. Some of this testimony persuasively indicates that there was much ore in the cavity of a high grade that was not adequately represented by the samples, and after much deliberation our conclusion is that the record is insufficient to warrant a decision that the court below made any mistake in its finding that the number of cubic feet required to make a ton of first-class ore taken from the Conkling claim was 6, and that the number of cubic feet required to make a ton of the second-class ore taken from the Conkling claim was 7.62.

The court below found that there was no waste in the material extracted in 1907 and 1908, and that the waste in the material taken out in 1909, 1910, 1913, 1914, 1915, and 1916, wherever the matter of waste was important, was one-seventh. The King Company insists that the court should have found that one-seventh of the material taken in 1908 was waste, but the facts that there is no claim that there was any waste in the material extracted in 1907, that the material extracted in 1907 and 1908 was adjoining and similar, that the King company made no claim of waste in 1908 in its first two accounts, and a consideration of all the other evidence on this subject failed to convince that there was any error in the finding of the court in this regard.

The court concluded that one half of the ore extracted in 1907 was first-class, and that the other half was second-class, and that, in the ore extracted in 1908 the proportion of first-class to second-class was 1 to 2. Counsel for the King company argue that the evidence proves that not more than 40 per cent. of the ore extracted in 1907, and not more than one-eighth of that taken in 1908, was first-class ore. A review of the testimony on this subject has satisfied that there is more probability that the court found the proportion of first-class ore for these two years too small than there is that it found it too large. The evidence, however, does not make clear or convincing proof that any other proportion than that found by the court would be likely to be nearer the actual fact than its finding, and that finding is accordingly left undisturbed.

After May 1, 1909, the number of cars of first-class and of second-class ore was recorded in the shift bosses' records and the court below adopted the proportion of first-class to second-class deduced

from that record and applied it, not only to the ore taken after May 1, 1909, but also to the ore extracted during the first four months of that year. The evidence discloses no method more likely to produce a correct result. Many less important objections to the findings of the court as to the volume of the ore and many alleged discrepancies between the evidence and the findings have been argued and considered. It was impossible in the nature of the case to prove or to find the true value of this ore, the true amount of each class, or the exact proportion of the classes. The duty nevertheless was imposed upon the court below to make findings upon these subjects as near to the facts as it could. This court, upon a review of all the evidence upon these subjects, despairs of making findings or reaching a conclusion thereon more nearly correct than those of the court below, and they must therefore stand.

In determining the value of the ore taken by the King Company, the court divided the time of the taking into yearly periods, and, with one or two exceptions, found the value per ton of the ore extracted from the Conkling ground to be the same as the average yearly price per ton received by the King Company from the mixed ore of its class sold by the King Company during that year. Prior to April, 1907, the Kearns-Keith Company extracted and stored in drifts and levels 659.15 tons of crude or shipping ore and 252.06 tons of concentrates. This ore was shipped, assayed, and sold by the King Company after April, 1907, and its metallic contents were proved. The King Company insists that the metallic contents of all the ore taken from the Conkling mine should have been found to be the same as those of the K-K shipments, and that on that basis its value should have been estimated. This contention presents the question, Did the value per ton of the K-K shipments mined in 1906 probably more nearly represent the value per ton of the shipments mined from Conkling ground in the years 1907, 1908, 1909, 1910, 1913, 1914, 1915, and 1916, respectively, than the average value per ton of the mixed ore taken from the Conkling and adjoining ground in the same mine during those years respectively? A thoughtful review of all the evidence upon this subject has led the court to believe that this question must be answered in the negative.

The Conkling Company is discontented with the value of the ore found by the court, and insists that it is too low, and that its finding should have been based, not upon the yearly average price per ton obtained for the mixed ore, but upon the highest price per ton received by the King Company during each yearly period from any of the ore taken from the mine during such period pursuant to the rule that where one knowingly mixes the goods of another with his own or fails in his duty to keep them separate, so that the value of the former cannot be ascertained, he should suffer all the possible loss and inconvenience from his breach of duty. The existence and beneficence of this rule is conceded, but like other equitable principles and rules it must be so applied to the particular facts of each case, if possible, as to work out substantial justice to each of the parties to the litigation. If all the ore in controversy had been taken from

that part of Conkling ground easterly of the 135-foot strip, without the knowledge of the Conkling Company and without opportunity for it to examine the ore and measure the work or the cavity during the process of the extraction, it might have been just and necessary to charge the King Company the highest price it received from any of the mixed ore in each year. But the great bulk of the ore came from the 135-foot strip. The King Company claimed the exclusive ownership of that strip, and its officers testified that they believed that the claim was well founded. In view of the facts that the District Court sustained that claim, that the nature of the controversy was such that the King Company and its officers cannot be held to have been without probable cause to believe that its claim might be sound until it was otherwise adjudged by this court, and that from July, 1908, under the order of the court below, the Conkling Company had the privilege and opportunity of examining the ore as it was removed, and of surveying the cavities from which it was taken, this court is of the opinion that the use of the average yearly prices of the mixed ore sold as the basis of the estimated value of that taken from the Conkling claim is more likely to produce a just and equitable finding of its value than the use of the highest price of any of the mixed ore sold during each year. It is therefore unwilling to change the basis of the estimate of the value of the ore which the court below adopted.

Counsel for the Conkling Company also complain that the prices received by the King Company for the mixed ore it sold after January, 1909, were at least $3 per ton less than it could and should have obtained, and that on that account this court should increase the value found below of the Conkling ore taken during that time at least $3 per ton. The King Company proved without objection that it sold the mixed ore it mined after January 1, 1909, under the Heinze contract, which was made May 21, 1907, and ran for 10 years after January 21, 1909. It introduced in evidence without objection that contract, and two preceding contracts dated respectively September 1, 1903, and June 14, 1907, under which the King Company and its predecessor in interest had sold and delivered their ore to the American Smelting & Refining Company. Over the objection of the King Company the Conkling Company introduced in evidence two contracts of the American Smelting & Refining Company, one with Little Bell Consolidated Mining Company dated May 2, 1906, Exhibit No. 110, and one with the King Company dated May 25, 1911, Exhibit No. 111, and a contract between Wilbert Mining Company and Knight & Warnock, dated February 17, 1915, Exhibit No. 115, but neither of these three exhibits is found in the record in hand. The King Company also introduced in evidence the testimony of Mr. Howard to the effect that he had compared the Wilbert contract with the Heinze contract, and that, although there was some difference in the penalties imposed by the two contracts, the Wilbert contract yielded $4 or $4.50 per ton more to the vendor of the ore than did the Heinze contract on the sale of lots of ore described in Exhibits No. 113 and 114, but these exhibits are not in the record. The Wilbert contract was dated February 17, 1915. The Heinze contract was dated in 1907, more than 7 years

earlier. It covered a period of 10 years. There is no evidence before this court to show that the market value of the ore was the same or approximately the same in 1915 that it was in 1907. There is no evidence to show the time the Wilbert contract was to run. The record, however, contains two time contracts, under which the King Company or its predecessor sold its ore prior to the term of the Heinze contract, and the latter does not appear to be less favorable to the vendor than were the two contracts that preceded it.

Counsel for the Conkling Company argue that the King Company made the Heinze contract to sell its ore for less than its value from the fact that it contains an agreement for the sale to Heinze of a large amount of the stock of the King Company. But there is no evidence that he was buying the stock at a price greater than its value in order to get the ore at a price less than its value, and the legal presumption is that he agreed to pay a fair price for both. There is, therefore, no evidence here that the prices obtained under the Heinze contract were less than they should have been, except the testimony of Mr. Howard that Wilbert's contract of 1915 was more favorable to the vendor than the Heinze contract of 1907. This is insufficient to warrant an appellate court in changing the finding of the court below, in view of the facts that the Heinze contract of 1907 was more favorable to the vendor than its prior contracts, that more than 7 years intervened between the Heinze contract and the contract of Wilbert, that the court below had before it for examination and comparison the Little Bell contract, the King contract of May 25, 1911, and the Wilbert contract, neither of which is presented to this court, and that the court below upon a view of all this evidence concluded that the price fixed by the Heinze contract represented the fair value of the ore.

[3] In the accounting, the court below allowed to the King Company, as a part of its expense of extracting, preparing and marketing the ore, $22,283.14, which it found to be one-half of the King Company's predecessor's expense, and of the interest thereon to May 1, 1907, in cleaning and extending the Alliance Tunnel and the crosscuts and drifts therefrom in Conkling ground. The King Company complains that the court did not allow it the whole of that expense and interest thereon, and that it did not also allow it $10,853.12 more on account of the expense and interest thereon of driving certain crosscuts and drifts from the tunnel on account of which no allowance was made. On the other hand, the Conkling Company contends that nothing should have been allowed on account of any of these expenses.

[4] The general rule is that a cotenant in the exclusive possession of mining property, who extracts and sells the ore, may charge against its proceeds the reasonable and necessary expenses of its extraction and marketing. The ore was all extracted and marketed between September, 1906, and the year 1917. The expenses of cleaning and extending the Alliance tunnel were incurred beween 1901 and 1906. The Arthur lode mining claim lies easterly of the Conkling claim, and the parties hereto and their predecessors in interest have owned the former in the same proportions as they have owned the latter from a time anterior to 1902. The portal of the Alliance Tunnel is more than

a mile and a half easterly of the east line of the Arthur claim, and more than 10,000 feet distant from the stopes in the westerly end of the Conkling mine from which the ore in dispute was taken, and none of it was ever taken out through that portal. The King Company (in fact, its predecessor in interest) was, and it now is, the exclusive owner of the land east of the Arthur claim, and prior to the year 1892 it or its predecessor ran this tunnel until it reached a point about 90 feet east of the easterly line of the Conkling claim near its northeast corner. By the year 1902 this tunnel had become caved in places and badly out of repair. Thereupon the King Company cleaned it out and drove it westerly along near the northerly line of the Conkling claim, part of the way without, but most of the way within, that claim, until it passed out of the westerly end thereof whence it was connected by a drift from the tunnel to the Silver Hill shaft and station which are located a short distance northwest of the southwest corner of the Conkling claim. On January, 1905, this tunnel had reached a point about 135 feet east of the west line of the Conkling ground.

The King Company during the year 1906 drove the McKay crosscut from that point, which was a few feet south of the north line of the Conkling, southerly, nearly at right angles to the course of the tunnel, and while so doing it discovered the ore in controversy, in November or December, 1906, near the south line of the Conkling ground. Inspired by this discovery, it concealed the ore and the fact, and bought for $125,000, in April or May, 1907, the Belmont mining claims, some of which adjoin the Conkling on the west and contained a part of the body of the ore the King Company had discovered, and on one of which the Silver Hill shaft and station is located. It has used the tunnel to approach and to aid it in working the Belmont group of mines, and has used some parts of it to take out some of the Conkling ore. There is some ore remaining in the Conkling, but as part of the tunnel is in ground owned by the King Company exclusively, the Conkling Company has no right to use the tunnel to take that ore out. A large quantity of water gathers in and flows in a ditch repaired and extended during the cleaning and extension of the tunnel, and the King Company has had and still has the use of this water for its boilers and for household and culinary purposes, and has received for the surplus above its needs, between 1900 and 1907, $18,391.55, and between June 1, 1907, and December 31, 1916, $23,000, in all $41,391.55; but no credit for any of this income has been taken into consideration or allowed to the Conkling as an offset against the expense of cleaning and extending the tunnel, charged against it. The court below allowed to the King Company the entire amount of the expense of driving the McKay crosscut and the interest thereon. Should it also have allowed to it the expense of cleaning and driving the tunnel and the opening of the many drifts and crosscuts along its course in Conkling ground, from which some, how much we know not, ore was extracted, and which expense the King Company claims amounted, with interest, to $62,842.43?

It argues that this allowance should be made because this expenditure resulted in the discovery and the extraction of the Conkling

ore. By the same mark it caused the discovery, the purchase, and the extraction by the King Company of the ore from the Belmont group; and if the Conkling Company is to pay for the tunnel on the ground here urged, why should not the King Company account to it for the Belmont ores? It is the reasonable proximate causative, not the remote and inconsequential, expense of discovering, extracting, and marketing ore that is allowable to the tenant who secretly takes the common property and appropriates to himself his cotenant's share of its proceeds. There is testimony in the record that, if the Conkling Company had known where the ore was, it would have cost it $82,-000 to have sunk the requisite shaft to reach it; but this is no reason why the Conkling Company should pay to its cotenant, who discovered and appropriated its share of the ore, any more than the reasonable approximate expenses of the discovery, extraction, and marketing thereof.

The tunnel, before it was cleaned and extended, did not produce and conduct the volume of water and produce the revenue from that source which it has since brought; nor was it useful to the King Company as an adit to the ores in the Belmont group or in the removal thereof. If the Conkling Company were to pay for this cleaning and driving, then it should have credit for at least some of the proceeds and benefit derived from it by the King Company. The revenue the latter has derived from the sale of the surplus water alone, with interest thereon to May 1, 1907, exceeds all the expenses of cleaning and extending the tunnel and the interest thereon, to say nothing of the value of the use of all the water the King Company needed and the benefit of its use of the tunnel for transportation purposes. In the opinion of this court none of the expense of cleaning and extending the Alliance Tunnel and the drifts, chutes, and crosscuts therefrom should have been allowed to the King Company in this accounting.

The King Company urges that it should be allowed what it would have cost the Conkling Company to have sunk a winze from the 500 to the 700 level, $50 per foot, or $10,750, because the King Company took its ore up from the 600 and 700 levels through its Silver King shaft, which it had sunk to the 900 level at the expense of $125 per foot; but the King Company sunk that shaft on its own ground for its own purpose, and in the accounting it was allowed the agreed cost of mining and tramming the Conkling ores which the King Company took out through that shaft. The Conkling Company has no right to the use of that shaft, it owns no interest in it, and there was no error in the refusal of the court below to make an additional charge against it for the expense of sinking a winze that never was sunk.

The King Company also insists that, in addition to the stipulated cost of mining, milling, etc., the Conkling ore, which was allowed to it in the accounting, it should be allowed $18,304.69, which it claims is the proportion of the interest from May 1, 1907, to April 1, 1916, on the amount it invested in mine buildings and machinery, that the Conkling ore bore to all the first-class ore the King Company took from that mine during that period, and $14,463.24, which it claims is the proportion of the interest from May 1, 1907, to April 1, 1916, on

the amount it had invested in mill buildings, etc., that the number of tons of Conkling concentrates bore to the number of tons of concentrates derived from the entire mine. But there is no proof that these investments in mine buildings, mill buildings, and machinery were made for the purpose of handling the ore from the Conkling claim, nor that they would not have been made, if there had been no discovery of ore in the Conkling claim. The Conkling Company has never had, and has not now, any title or right of use of these buildings or machinery, or of any of them. The King Company took the Conkling ore without the request or consent of the Conkling Company, it failed to keep it separate or to account for it, it has been allowed in the accounting the stipulated cost of mining, tramming, and milling, and its claim to be allowed a part of the interest upon its investments in addition does not appeal to the conscience of a chancellor.

The conclusion of the whole matter is that the $542,222.58 named in the decree should be increased to $570,076.50, by the addition to the former amount of the sum of $27,853.92, which is three-fourths of $22,283.14, the expense of cleaning and extending the Alliance tunnel, plus the interest on that three-fourths from May 1, 1907, to March 1, 1918.

Let the decree be so modified, and, thus modified, let it be affirmed.