HANNA IRON ORE CO. v. CAMPBELL.

CAMPBELL v. HOMER ORE CO.

1. MINES AND MINERALS—TERMINATION OF LEASE—IMMOVABLE STRUCTURES—TENANCY IN COMMON.

Under clause of mining lease providing that in case lessee failed to remove stock piles, machinery and structures it had placed upon the land within 90 days of the termination of the lease, the lessors became entitled to such installations as could not be removed, the cotenants in common became entitled to their aliquot shares thereof.

2. SAME—TERMINATION OF LEASE—MOVABLE PROPERTY—TENANCY IN COMMON.

Since upon termination of a mining lease from tenants in common, the right of possession of owner of an undivided 1/6th interest and who was the lessee of 19/24ths of the remaining 20/24ths was not less than the right of possession of the owner of a 1/24th interest, such lessee would not be required to remove the stock piles, machinery and structures it had placed upon the land since it could rightfully replace them upon the land immediately thereafter, hence the forfeiture of the lease did not operate to give the owner of the 1/24th interest an interest in movable property.

3. EQUITY—ACCOUNTING—ADEQUACY OF REMEDY AT LAW.

Case was properly adjudicated on the equity side of the court where gist was an accounting between tenants in common, extending over a substantial period of time and was of a detailed and complicated character incapable of intelligent submission to, and accurate decision by, jury.

4. MINES AND MINERALS—ACCOUNTING—WEIGHT OF IRON ORE—JOINTLY-MINED TRACTS.

In suit for accounting between parties to a mining lease finding of trial court that a certain number of tons of iron ore were mined from tract involved is not disturbed where, notwith-

standing ore from other tracts was mined from the same shaft and not weighed until shipped, method of . computation of weight substantially reflected an accurate measure and appellants were not prevented from checking the accuracy of method used.

5. SAME—ACCOUNTING—FIXED SALES PRICE OF IRON ORE.

In suit for accounting as to iron ore mined from tract in which the parties were some of the tenants in common of the lessor interest and the lessee, the price of the ore at the mine taken as the sales price as fixed by the office of price administration less fixed transportation charges is adopted where it was to lessee's interest to obtain as much as possible for the ore.

6. SAME—ACCOUNTING—COST OF PRODUCTION—ROYALTY—DEPLETION.

In suit for accounting under mining lease, charges for royalty and depletion can not be charged as a cost of production.

7. SAME—COST OF PRODUCTION—DEPRECIATION.

Charge of 25 cents per ton of iron ore for depreciation of property used in production thereof, rather than so-called rental charge of 20 cents per ton as used by trial court, held, proper, where testimony of sole witness on subject was that 25 cents was based upon experience of mining company and appellants' attorney admitted same was proper.

8. EVIDENCE—JUDICIAL NOTICE—DEMAND FOR IRON ORE.

The Supreme Court takes judicial notice of the fact that during the period from November, 1941, to May, 1945, there was an extraordinary demand for iron ore because of World War II, especially in view of the imposition of price controls on the sale of such ore.

9. MINES AND MINERALS—COST OF PRODUCTION—SELLING EXPENSE—OPERATING COMMISSION.

Mining lessee's charge of 10 cents per ton of iron ore as commission for "selling expense" and "top supervision," is reduced to 5 cents per ton in suit for accounting, where there is testimony that "selling expense" would be about 5 cents per ton but no necessity therefor existed during period for which accounting was made, the charge for operating commission being justifiable as an item of production cost.

10. SAME—COST OF PRODUCTION—ADMINISTRATIVE SERVICES.

Administrative services rendered incident to mining operations on tract in which parties to suit for accounting held interests and other nearby tracts, as well as charges for insurance on the properties and workmen's compensation reserve held, proper overhead charges in determining cost of production.

11. SAME—ACCOUNTING—DEPRECIATION—NONMOVABLE PROPERTY.

In suit for accounting between lessee under forfeited iron min-
ing lease and some of the tenants in common holding a share
of the lessor interest, latter were entitled to their aliquot
share of the sum recovered through sale of ore by the lessee
as depreciation on that portion of the capital investment repre-
sented by nonmovable property and a like aliquot share of
future sales.

12. SAME—ACCOUNTING—JOINT OPERATION OF ADJOINING SEVERALLY-
OWNED TRACTS—DEPRECIATION.

In suit for accounting between lessee under forfeited iron-mining
lease of a tract operated in conjunction with other tracts and
some of the tenants in common holding a share of the lessor
interest, latter are not entitled to a rental charge for use of
nonmovable equipment on their tract in operating an adjoin-
ing tract in mining ore owned by others, where such item of
charge is covered in allowance for depreciation.

13. SAME—RATE OF PRODUCTION—GOOD FAITH—DAMAGES.

No damages are allowable to owner of a share of the lessor in-
terest under lease of a tract for an iron mine because opera-
tion of other tracts in conjunction therewith slowed down
production from tract in controversy where record does not
show holders of lessor interest have a right to complain and, in
absence of bad faith, the determination of the rate of produc-
tion rests exclusively with the lessee who incurred the expense
of development.

14. SAME—ACCOUNTING—PROFITS ON ADJOINING TRACT.

In suit for accounting under a forfeited iron-mining lease
whereby the owners of a share of the lessor interest in one of
several tracts seek to obtain a share of profits made by lessee
in operation of an adjoining tract, that were enhanced because
of use of equipment forfeited to lessors, relief is denied where
record fails to show specific amount, if any, for which lessee
should account incident to such claim.

15. SAME—CONFUSION OF GOODS—MINED ORE—COST OF SEGREGATION.

Where lessee under forfeited iron-mining lease keeps records that
reflect the quantity and physical properties of ore mined,
shown to have a high sulphur content and, therefore, less de-
sirable, the mixture of such ore with that of other mines
operated by same lessee did not constitute lessee a wrongdoer,
especially where holders of a share of the lessor interest do
not show they are ready and able to bear the extra cost that

segregation of such ore would entail and the mixture benefits the lessor.

16. Courts—Record—Law of the Case.

Notwithstanding like controversy as to accounting period by lessee under forfeited mining lease was presented in previous case between plaintiff's predecessor and defendant, such determination is not controlling where very different record is presented in instant case.

17. Mines and Minerals—Accounting—Fiscal Period.

Where lessee under forfeited iron ore mining lease keeps its records on an annual basis, its fiscal year is adopted as the period for accounting to lessor tenants in common with interest chargeable from termination of each fiscal year.

Appeal from Iron; Bell (Frank A.), J. Submitted April 15, 1947. (Docket No. 80, Calendar No. 43,724.) Decided October 13, 1947.

Assumpsit by David H. Campbell and wife against Homer Ore Company, a corporation, for money due for ore mined.

Bill by Hanna Iron Ore Company, a Michigan corporation, against David H. Campbell and wife to enjoin law action and for an accounting.

Law case transferred to the chancery side of the court. Decree for plaintiff in the chancery suit. Defendants appeal. Modified and affirmed.

*M. S. McDonough* and *Leigh C. Caswell* (*W. C. Scott* and *Semmes, Goodrich & McEvoy,* of counsel), for plaintiff Hanna Iron Ore Company.

*Meredith P. Sawyer* and *Raymond Turner,* for defendants Campbell.

North, J. David H. Campbell and Mary E. Campbell filed a declaration against Homer Ore Company, a corporation, seeking to recover judg-

ment for the value of their share of iron ore mined from real property in Iron county which they own in common with defendant and, also, for the value of the use of certain property claimed to have been used by the corporation in the operation of "adjoining mines." Thereupon Hanna Iron Ore Company, a Michigan corporation, filed its bill of complaint herein against David H. Campbell and Mary E. Campbell, alleging that it had succeeded to all the rights of Homer Ore Company, a dissolved Michigan corporation, that it and defendants Campbell were cotenants of 60 acres from which it and its predecessor had mined ore, that it was liable to account to defendants Campbell and had in fact offered to account but defendants insisted on an arbitrary figure for accounting that bore no relation to the "true profits," that defendants' "claims and pretenses" constituted a cloud on plaintiff's interest in said 60 acres, that plaintiff feared that defendants would institute numerous actions. The relief sought was that defendants be enjoined from proceeding with the suit they had commenced and from instituting any further suits pertaining to the same subject matter, that "the rights and obligations" of the parties be adjudicated and that a method of accounting be prescribed, that plaintiff's title be determined to be free of any cloud resulting from defendants' "claims and pretenses" and "for such other and further or different relief as equity and good conscience may require."

The same day that the bill of complaint was filed, an order to show cause and a temporary restraining order forbidding defendants to proceed with their law action were entered. Defendants filed a motion to dismiss the bill of complaint. The order to show cause and the motion to dismiss were heard at the same time. The trial judge before whom these matters were brought on for hearing was of

the opinion that implicit in the law action were so many issues of a complicated nature that it could "never be tried before a jury on the law side of the court," and he entered an order transferring the suit instituted by the Campbells to the equity side of the court, providing a certain time for necessary pleadings to be filed and for purposes of trial consolidating and combining the law case with the equity suit initiated by plaintiff.

Hereinafter for clarity and brevity the Hanna Iron Ore Company will be referred to as plaintiff and the Campbells as defendants. This appeal is by defendants from the decree entered in the circuit court. On trial of the case it appeared that plaintiff conducted mining operations in several mines on adjoining parcels of real estate and that these mines are known as the Homer group. This Homer group consists of the Homer mine, the Cardiff mine, the Minckler mine, and the Wauseca mine. The inserted sketch indicates the relative location of these mines, each full square representing 40 acres of land.

. The Homer, Cardiff and Minckler mines are operated as a group with all ore being removed through a shaft on the north 40 acres of the Homer mine. Some ore from the Wauseca has been removed through the Homer shaft; the balance of the Wauseca ore has been removed through a shaft on the Wauseca property. Ore is hauled underground to the Homer shaft in tram cars pulled by electric locomotives. Ore is loaded into these cars that are all of the same size by automatic loading equipment. Plaintiff computes the tonnage of each tram car at 3.4 tons, but the ore is not weighed at the mine at any time. An employee of the Hanna Iron Ore Company is stationed at the Homer shaft and keeps a record of the number of tram cars that come from each mine and a daily tonnage report is made. This employee also removes one scoop of ore from each car so that an analysis of its physical properties can be made. The ore is then crushed and in a skip of fixed unvarying tonnage is hoisted through the Homer shaft. At the surface the ore is either loaded in railroad cars for shipment or dumped in a common stockpile which contains ores from all of the mines in the Homer group. By comparing the number of trams and skips it can be determined if the trams are being loaded uniformly. It is physically possible but uneconomical to keep the Minckler ore separate. Ore from the Homer group is transported by rail to docks at Escanaba. The dock agent weighs each railroad car of ore and submits that information to the Hanna Iron Ore Company. By applying the ratio which the tonnage of ore that was taken from a given mine bears to the total tonnage taken from all the mines in the Homer group to the total tonnage that has been shipped, plaintiff computes the tonnage of ore from a given mine that has been transported to the docks. For purposes of analyses samples of the ore are

also taken from the loaded railroad cars. At Escanaba the ore obtained from the Homer group is mixed with ore from other mines owned by plaintiff.

In the case of *Campbell* v. *Homer Ore Co.*, 309 Mich. 693, involving plaintiff's predecessor and defendants in the case at bar, we held that plaintiff's predecessor had forfeited to defendants, who were and are the owners of an undivided 1/24th interest in the fee of the mineral tract known as the Minckler, its lease as to said undivided 1/24th interest. We also decided that plaintiff's predecessor "as a tenant in common was entitled to mine the ore and to deduct the cost." The forfeited lease contained the following provision: "It is mutually understood and expressly agreed by and between the said parties to this agreement that the said party of the second part (the lessee) may erect and construct all buildings, put in engines and machinery, tools, railroad tracks and structures and other improvements upon the said premises which are or which may become necessary, suitable or convenient for the mining and removal of ore from the said premises, * * * provided that upon the termination of this agreement by the acts of the parties or either of them or by limitation, the said party of the second part * * * may within 90 days after such termination remove all stock piles, engines, tools, machinery, buildings and structures owned, erected or placed by said party of the second part, in or upon said land." If not so removed by the lessee the lessor became possessed of the specified property, since the lease provided that in default of removal the specified items passed to the lessor.

Pursuant to this provision of the lease certain movable equipment had been installed and it was not removed within 90 days after the lease had been terminated. Defendants claim that they therefore acquired 1/24th interest therein. Defendants'

ownership of an undivided 1/24th interest of the installations that could not be removed under the foregoing provision is conceded. In considering the issue as to the ownership of the removable property which plaintiff's predecessor did not remove and which is here in controversy, it must be kept in mind that at the time the lease was terminated, plaintiff's predecessor owned an undivided 1/6th of the Minckler tract and was the lessee of 19/24ths of the remaining 20/24ths of the fee. As such plaintiff's predecessor's possessory rights in said tract obviously were not less than those of defendants. And since as a tenant in common with defendants, plaintiff's predecessor was entitled to and did continue to conduct mining operations on the tract in question, it would be contrary to common sense if not against public policy to hold that plaintiff's predecessor was required to perform the useless and wasteful task of removing within the 90-day period the movable equipment which could be immediately thereafter rightfully replaced on said real estate. Because of the fact that the ownership of the fee had been divided into many parts after the lease, which was originally entered into by an individual lessor and an individual lessee, had been executed, the termination of the lease as to an undivided 1/24th of the land resulted in a situation that surely was not contemplated by the original lessor and lessee. Termination of a mere fraction of the lease should not operate to compel the lessee, particularly a lessee who was also the owner of an undivided 1/6th of the fee and who continued to hold a valid lease to 19/24ths of the remaining 20/24ths and to operate the mine, to engage in the useless undertaking of removing and immediately replacing equipment because of the termination of its rights as lessee of an undivided 1/24th interest in the property. Defendants by forfeiture of the lease acquired

no interest in the movable property in the Minckler tract.

The gist of this litigation is an accounting between tenants in common, extending over a substantial period of time, involving rather large sums of money, and as will more fully appear hereinafter is of such a detailed and complicated character that the trial court was fully justified in holding that the adjudication of the respective rights should be on the equity side of the court. Even as a chancery case the record presents an unusually difficult situation; and it seems clear it could not have been intelligently submitted to and accurately decided by a jury.

The principal issues of this litigation relate to plaintiff's duty to properly account to defendants for their share of the profits incident to mining ore from the Minckler tract between November 22, 1941 and May 22, 1945, this period being fixed by stipulation. Obviously it is necessary to determine how much ore was mined, how much was sold, what it was sold for, what the cost of production was, and the time when plaintiff should have accounted to defendants.

Amount of Ore. Evidence submitted by plaintiff shows that during the period in question 272,290 tons of ore were mined from the Minckler. Of this total 266,261 tons of ore were sold and the balance was in the stockpile on May 22, 1945. While in their statement of reasons and grounds of appeal defendants asserted the trial court erred "in not requiring plaintiffs to substantiate their statement of tonnage mined by measurements of the portion of ore body removed," defendants have not briefed or argued this point. It is true that the method plaintiff used in computing the tonnage of ore removed from the Minckler is not as accurate

as it would have been if that ore had been weighed separately after it was mined. However it seems probable that variation from the true quantity mined is small and the variation may be more or less. It is obvious that if plaintiff were required to weigh the Minckler ore separately both at the time it was mined and at the time it was shipped, the cost of production would be unreasonably enhanced. Defendants made no showing that they were willing to bear the cost of weighing the Minckler ore at the time it was mined. Further it seems clear that if the method used by plaintiff did not substantially reflect an accurate measure, the owners of the other 19/24ths of the fee who received royalty on a tonnage basis would have protested. There is no showing that plaintiff's method does not result in a figure that is substantially correct. Nor is there any evidence the plaintiff has prevented defendants from checking the accuracy of the method and results. Therefore the trial judge did not err in using the figure of 266,261 tons as the quantity of ore from the Minckler mine that was sold during the period in question. There was a balance of some 6,000 tons of Minckler ore on the stockpile. Defendants, of course, own an undivided 1/24th interest in this ore.

VALUE OF MINCKLER ORE SOLD. There is considerable controversy as to the value of the Minckler ore that was sold. However, during a major portion of the period in question the price of iron ore was fixed by the office of price administration. The price adopted by the office of price administration was based upon prevailing prices for iron ore between October 1 and October 15, 1941. Therefore in determining the price of ore sold during the period in question, this Court will adopt the price as prescribed by the office of price administration.

That price was $4.35 per ton f.o.b. Lake Erie, ore guaranteed at 51.50 per cent. iron content, in the natural state. O.P.A. regulations provided that if the iron content of ore was greater than 51.50 per cent., the price could be raised; and if lower than 51.50 per cent. the price should be reduced, in accordance with formulae adopted by the office of price administration. Using the formulae and maximum prices set by the office of price administration, plaintiff computed the price of the Minckler ore on the basis of the daily analyses of ore taken from the Minckler. It is obvious, of course, that the accuracy of the figure arrived at depended upon the accuracy of plaintiff's analyses of the ore mined from the Minckler; but it is also obvious that it was to plaintiff's interest to obtain as high a price as possible for the Minckler ore as plaintiff received 23/24ths of the net profit as against defendants' 1/24th. And certainly it was indispensable that plaintiff made accurate analyses to forestall controversy with purchasers.

To obtain the price of the ore at the mine plaintiff deducted from the sales price fixed transportation charges about which charges there is no controversy. A summary of the results of plaintiff's figures is as follows:

| Year | Tons Shipped From Minckler Mine | Value per Ton F.O.B. Mine (Per O.P.A. regulations) | Amount |
|---|---|---|---|
| 1941 (Nov. 22 to Dec. 31) | 1,964 | $2.5513 | $ 5,010.75 |
| 1942 | 137,651 | 2.5840 | 355,687.42 |
| 1943 | 58,027 | 2.6441 | 153,429.55 |
| 1944 | 64,383 | 2.5772 | 165,930.17 |
| 1945 (Jan. 1 to May 22 incl.) | 4,236 | 2.5036 | 10,605.07 |
| TOTAL | 266,261 | $2.5939 | $690,662.96 |

Notwithstanding defendants' contention to the contrary, our review of this record brings the conclusion that decision should be based upon the sales price of the ore as fixed by the office of price administration incident to which we accept plaintiff's figures above quoted. Therefore we determine that for the purpose of this accounting the price or value of the Minckler ore f.o.b. mine for each year is as set forth above for the respective years.

COST OF PRODUCTION. The next element essential to decision is to determine the cost of production. Plaintiff introduced exhibit 30 which sets forth 49 items of expenditure claimed to have been incurred in mining ore in the Homer group. Having carefully reviewed the record, we are of the opinion that subject to the exceptions about to be noted each and every item on plaintiff's exhibit 30, including depreciation for which the trial judge substituted a rental charge, should be allowed in computing the cost of production. The result of our computation of cost of production is hereinafter set forth.

Items 39 and 40. These charges for royalty and depletion, as plaintiff has now conceded, can not be charged against defendants in computing the cost of production.

Item 41. This item is for depreciation of properties used in the operation of the Homer group and is in controversy. The trial judge in his opinion stated that depreciation was a proper charge but in his decree he replaced depreciation with a rental charge for use, saying it was a "misnomer" to designate this charge as depreciation and that the charge "covers use more than recovery of value." The trial judge adopted a figure of 20 cents a ton as a proper rental charge to be included in the cost of mining. The only witness who testified as to a rental charge was a mining engineer called by plain-

tiff and he testified: "They should be charged with a proper rental which would probably be measured by this same figure of depreciation.  *  *  *  The depreciation charge appears at 25 cents per ton; I think that is approximately the correct figure for depreciation and amortization." The "figure for depreciation" used by plaintiff is 25 cents per ton. Plaintiff used this figure on the basis of experience. Plaintiff's witness, an accountant, testified: "It has been the experience of M. A. Hanna Company in connection with these mining operations, experience in high phosphorous mines, that 25 cents is the rate which should be generally applied." One of defendants' attorneys toward the end of the trial practically admitted that 25 cents per ton was a proper charge. For the purpose of this accounting we think this item may properly be considered depreciation, and on the record a charge of 25 cents per ton for depreciation should have been allowed as an item of cost of production by the trial judge instead of a rental charge of 20 cents per ton.

Item 47. This item is designated by plaintiff on exhibit 30 as "commission" in its cost of production. It is challenged by defendants. It appears that plaintiff is wholly owned by National Steel Company, and M. A. Hanna Company, plaintiff's operating agent, owns between 25 per cent. and 35 per cent. of the stock of National Steel Company. It also appears that substantially all of plaintiff's ore is purchased by National Steel Company and its subsidiaries. Plaintiff's witness J. P. Neiser, an accountant employed by M. A. Hanna Company, testified, "Item 47 on the cost sheet exhibit No. 30—commission—was 10 cents per ton. It covers selling commission, operating and executive supervision and transportation and handling. The M. A. Hanna Company bills the Hanna Iron Ore Company

for that charge, and gets paid." In its brief plaintiff contends that the commission covers "selling expense" and "top supervision," and says that "it is this top supervision and the ability and initiative which it possesses, and sometimes its influence and connections, that made possible the profitable operation of mines such as the Minckler." As stated in plaintiff's brief:

"It is true that most of the product of the Minckler mine was sold to corporate affiliates of the plaintiff but it is also true that the sale of the Minckler ore with its high sulphur content was only possible because M. A. Hanna Company was in a position to mix this ore with ore from lower sulphur mines which it operated to make a product that would be salable (to plaintiff's affiliates or anyone else) at the ceiling price, and that this was only possible because of the ingenuity and ability, the influence and connections of M. A. Hanna Company."

However plaintiff's attempt to justify this commission is not persuasive in view of facts disclosed by the record. The record discloses that plaintiff and not M. A. Hanna Company owned the mines whose ores were low in sulphur content and which when mixed with the ore from the Minckler produced a salable product. Since plaintiff and defendants owned all the ores that went into the mixture it is difficult to see how M. A. Hanna Company is entitled to charge plaintiff and defendants "because (as stated in plaintiff's brief) M. A. Hanna Company was in a position to mix this ore." It does not appear that the mixture was based on any secret formula or that only M. A. Hanna Company was able to accomplish the mixture. It is clear from the record that to effect the mixture it was necessary to analyze the ores and mix them in proportion to their physical properties to obtain the

Weir grade or a marketable grade of ore. The actual physical mixing of the ores to obtain the mixture known as Weir grade was done at the docks at Escanaba "by the docks," and not the M. A. Hanna Company. As plaintiff is a wholly-owned subsidiary of National Steel Company, and since National Steel Company and others of its subsidiaries purchased substantially all, if not all, of the Homer ore, it is quite impossible to see what service M. A. Hanna Company rendered which would warrant a selling commission.

This Court will take judicial notice of the fact that during the period in question there was an extraordinary demand for iron ore because of World War II. The imposition of price controls on the sale of iron ore also quite conclusively demonstrates the great demand for iron ore. Under these circumstances insofar as item 47 is based on any claim to a selling commission, it can not be sustained as reasonable or necessary. And as to the claim of the cost of "top supervision" being included therein, there is no showing as to what proportion is based on "top supervision." A mine appraiser, employed by the Michigan State conservation department in estimating the cost of production, allowed 5 cents a ton as a cost of selling. On this record item 47 designated as "commission" should be reduced to 5 cents per ton. As operating agent, M. A. Hanna Company is entitled to make some charge, but there does not appear to be any justification for a selling commission. Therefore, by disallowing 5 cents per ton as a selling cost, the figure used by the State appraiser, there will remain 5 cents a ton as operating commission, which is justly chargeable as an item of production cost.

Items 48 and 49. These items are for administrative services rendered plaintiff chiefly by M. A.

Hanna Company. We are not in accord with defendants' contention that the services for which these charges are made are not essential to the operation of the Minckler mine. It must not be overlooked that it is essential to the successful operation of the Minckler mine that it should be operated in conjunction with the operation of the other mines in the Homer group. As the circuit judge held, the items included in 48 and 49 are proper overhead charges for this group of mines, and it is only just and proper that the Minckler mine should bear its proportionate share of such charges.

While defendants complain to some extent of certain other items in exhibit 30 being included in the determination of the cost of production, such as insurance on properties, workmen's compensation reserve, et cetera, our review of the record brings the conclusion that defendants' contentions as to such items are not meritorious.

The following controversial phases of the record also require comment.

1. DEFENDANTS' SHARE OF DEPRECIATION. Prior to April 1, 1941, when plaintiff's predecessor forfeited its lease to defendants, the capital investment on the Minckler was $197,621.01, which included $36,869.27 of movable property held in this opinion to belong to plaintiff. There was therefore capital investment of $160,751.74 nonmovable property in which defendants acquired a 1/24th interest as a result of the forfeiture of the lease by plaintiff's predecessor. During the period in question plaintiff in computing cost of production charged depreciation at the rate of 25 cents per ton, thereby recovering $66,565.25. While plaintiff is entitled to recover the value of movable equipment by apportioning part of the 25 cents per ton which we have

held to be a proper rate of depreciation, we think that as between the parties to this litigation the sum of $66,565.25 recovered by plaintiff should be treated as though it represented only recovery of value of the nonmovable equipment on the Minckler. In this view defendants are entitled to the sum of $2,773.55 which plaintiff practically conceded. The total sum which defendants shall ultimately be entitled to as their share of depreciation is $6,698. As in this accounting defendants will recover the sum of $2,773.55, there will remain the sum of $3,924.45 which defendants will be entitled to receive in the future at the rate of 1/24th of 25 cents for each ton of Minckler ore that is sold. Defendants are entitled to recover this sum of $2,773.55 as of the following periods in the following amounts:

| | | |
|---|---|---|
| November 22 to December 31, 1941 | $ | 20.45 |
| | 1942 | 1,433.86 |
| | 1943 | 604.45 |
| | 1944 | 670.66 |
| January 1 to May 22, 1945 | | 44.13 |
| | Total | $2,773.55 |

2. Defendants' Claim for Rent. This claim is for the use of the Minckler mine by plaintiff in developing or operating the Wauseca mine. On this point we are in accord with the trial judge who in his findings said, "I think whatever Mr. Campbell has lost by the use of that drift and shaft on the Minckler for the mining of Wauseca ore he has been benefited by the use of the Homer drifts and Homer shaft and the pumping which goes all along the line and affects the water on all properties, so I would allow nothing for the use of the shaft, and the decree may so order." However, the trial judge did allow defendants to make a rental charge of $400 a year for the use plaintiff made of defend-

ants' 1/24th interest in the nonmovable capital equipment in the Minckler in mining ore. As we have held that instead of a rental charge, a depreciation charge should be made to recover the value of capital equipment and as we have further held that defendants are entitled to participate in the sums recovered or reserved as depreciation, defendants are not entitled to charge rent for the use of their 1/24th interest in the nonmovable equipment. Therefore the defendants will not be allowed to charge plaintiff this $400 item of rent. It is compensated in our allowance of depreciation.

3. DEFENDANTS' CLAIM FOR DAMAGES. Defendants claim damages on the theory that plaintiff's operation of the Wauseca mine slows down production in the Minckler and in the Homer in which latter mine defendants have royalty rights. However the record does not show defendants are in a position to complain as to the rate of production in either mine. In the absence of bad faith, determination of the rate of production rests exclusively with plaintiff who has incurred the expense necessary to develop and operate the Minckler mine, receiving in this undertaking no contributions whatever from defendants. We find no merit to this claim for damages.

4. DEFENDANTS' CLAIM OF SHARE IN WAUSECA PROFITS. We have not overlooked defendants' contention that by reason of plaintiff's use of Minckler equipment in operating the Wauseca mine plaintiff has thereby derived greater profits than it otherwise would have; and that plaintiff should be required to account to defendants for 1/24th of such additional profit. This issue is not at all definitely presented in the pleadings nor do we find in the record testimony which would be requisite to ad-

judicating this claim in favor of defendants. It would be mere speculation on this record to find any specific amount to which defendants are entitled in the nature of this claim. Since the record does not contain competent testimony establishing in what amount, if any, plaintiff should be required to account to defendants incident to this particular claim, defendants can not be decreed relief of this character. Further, this is only another element which enters into the cost of operation of this group of adjoining mines, from which joint operation an advantage accrues in the operation of the Minckler mine.

5. Confusion of Goods. We may briefly dispose of defendants' contention that a rule of damages based upon the doctrine of confusion of goods should be applied to this case. Plaintiff keeps records that reflect the quantity of ore that is mined from the Minckler. It makes daily analyses of the physical properties of the ore. Thus at any given time plaintiff can furnish defendants with reasonably accurate data as to their share of the ore that has been taken from the Minckler mine. And as we said before, it appears that defendants benefit from the fact that the ore is mixed. This record discloses that the Minckler mine because of its low grade of ore can not be successfully operated except in conjunction with other mines wherein the ore is of a lower sulphur content. Plaintiff's witness Cannon testified: "The sulphur content on the Homer is the lowest; the Cardiff second lowest; and the Minckler has the greatest, in the mineable areas. I don't sell the ore, but I have always been told that that kind of ore could not be shipped on account of that sulphur and we have always been held to mix it with the other ores." If defendants insist that they

are entitled to have their 1/24th of the ore kept separate and apart not only from the plaintiff's 23/24ths of the ore taken from the Minckler, but separate from ores mined from other mines, defendants must show that they are ready and able to bear the extra cost of this segregation. This they have failed to do. There is no merit in defendants' assertion, "Plaintiff is a wrongdoer through mixture of the common ores with others before permitting its cotenant to determine the amount or grade mined."

ACCOUNTING PERIODS. Another item of controversy in this suit is what under the circumstances should be the period of accounting by plaintiff to defendants. While we passed upon a like controversy in *Campbell* v. *Homer Ore Co., supra,* that determination is not binding in the present appeal in which we have before us a very different record. On the present record we hold that the period of accounting should be on an annual basis in accordance with plaintiff's fiscal year. Plaintiff keeps its records on an annual basis and replaces figures initially based on estimates with figures based on actual experience at the end of each operating year. Therefore an accounting period based on plaintiff's fiscal year is, under the present record, determined to be a proper period for accounting. Such an accounting should have been made by plaintiff at the close of each fiscal year during the period herein involved. Therefore in the accounting interest at the rate of 5 per cent. per annum will be charged against plaintiff from the termination of each fiscal year (or fractional fiscal year) to the date of the decree.

In accordance with the holdings announced hereinbefore we have computed from figures disclosed by

the record the cost of production for each year or fractional year involved in this litigation. The method followed was simply to adjust the items of cost as shown on plaintiff's exhibit 30 as hereinbefore indicated for each period in question and to divide the total cost of production as thus obtained by the total tonnage of ore mined in each period in question. Thus for the year 1944, plaintiff's exhibit 30 showed that the total cost of production f.o.b. mine was $692,618. From this sum we deducted $78,688.88 for royalty, $1,325.49 for depletion, and $12,833.43 as one-half of the commission (plaintiff charged $25,666.87 at 10 cents per ton but we have allowed a charge of only 5 cents per ton instead, resulting in the above figure of $12,833.43). The adjusted figure of 1944 total cost of production is therefore $599,770.20. Dividing this sum by 256,434, which is the total tonnage mined in 1944, results in $2.3389, which was the average cost of mining per ton in 1944.

By following the same steps we have determined that the cost of production per ton f.o.b. mine for each period was as follows:

| | | |
|---|---|---|
| November 22 to December 31, 1941 | | $2.5276 |
| | 1942 | 2.1108 |
| | 1943 | 2.1616 |
| | 1944 | 2.3389 |
| January 1 to May 22, 1945 | | 2.1390 |

To obtain the average profit per ton for each period in question it is only necessary to subtract the average cost of production from the price per ton for each period involved. By multiplying the profit per ton by the total Minckler tonnage sold in each period, the total net Minckler profit for the period is obtained. And by dividing this figure by 24, defendants' share of the profits for each period re-

sults. A summary of defendants' 1/24th share in the profits for each period in question follows:

November 22 to December 31, 1941    $    2.19
                              1942    2,713.44
                              1943·   1,166.34
                              1944      639.27
January 1 to May 22, 1945               63.96

A summary of the amounts plaintiff should have paid defendants follows:

| | | | |
|---|---|---|---|
| At the end of 1941 | Profit | $ | 2.19 |
| | Depreciation | | 20.45 |
| | | $ | 22.64 |
| At the end of 1942 | Profit | | $2,713.44 |
| | Depreciation | | 1,433.86 |
| | | | $4,147.30 |
| At the end of 1943 | Profit | | $1,166.34 |
| | Depreciation | | 604.45 |
| | | | $1,770.79 |
| At the end of 1944 | Profit | $ | 639.27 |
| | Depreciation | | 670.66 |
| | | | $1,309.93 |
| At the end of May 22, 1945 (due Dec. 31, 1945) | Profit | $ | 63.96 |
| | Depreciation | | 44.13 |
| | | $ | 108.09 |

Since plaintiff did not pay the above specified sums when they were due, defendants are entitled to interest as hereinbefore noted. This interest should be computed at the rate of 5 per cent. per annum on the respective amounts due from the date when the same should have been paid to the date of settling the decree in this Court or to some fixed date specified in the decree.

A decree in accord with the foregoing may be taken in this Court whereby defendants' suit at law

will be dismissed and plaintiff will be required to pay defendants \$7,358.75 together with interest computed in the manner above indicated. Defendants will have costs in the lower court as provided in the circuit judge's decree and costs of this Court to be taxed.

CARR, C. J., and BUTZEL, BUSHNELL, SHARPE, BOYLES, REID, and DETHMERS, JJ., concurred.