Rufus H. Troop, Plaintiff-Appellant, v. St. Louis Union Trust Company, Executor of the Will of Walter L. Rust, Deceased, et al., Defendant-Appellee.

Gen. No. 59-O-4.

Fourth District.

March 9, 1960.

Rehearing denied April 20, 1960.

Released for publication April 20, 1960.

Will P. Welker, of Vandalia, and Wham and Wham, of Centralia, for plaintiff-appellant.

Burnside and Dees, of Vandalia, for St. Louis Union Trust Company, Executor of the Will of Walter L. Rust, Deceased, defendant-appellee.

PRESIDING JUSTICE SCHEINEMAN delivered the opinion of the court.

The plaintiff, Rufus H. Troop, and the original defendant, Walter L. Rust, were the owners of the working interest in an oil lease (hereafter referred to as "this lease"). Troop owned ¾ths and Rust ¼th. Troop was the manager of this lease which had two producing wells, and he also owned the entire working interest of another lease adjoining to the south, which had two producing wells, and he managed that also. Troop filed this suit in equity to foreclose a partnership lien, because Rust had not paid his share of operating expenses over a period of some eight years. Rust counterclaimed on various grounds, the important one being a claim that Troop had wrongfully and fraudulently commingled the oil from this lease with that of his other lease, and failed to divide in proper proportions. Before final decree Rust died and his executor was substituted. There are no important questions on the pleadings.

The Chancellor heard voluminous evidence and entered a final decree finding that Troop had tortiously commingled the oil from the two leases, that it was impossible to determine how much of the oil from this lease had been retained and not accounted for, therefore, the court applied the confusion of goods doctrine, awarding ¼th of all the oil to Rust, from both leases. The court also made a finding as to the total cost of operation of the leases, and charged ¼th to Rust, giving Troop a set-off against the amount awarded to

Rust. The net judgment for the period of years involved was $11,560.23.

On this appeal by Troop errors asserted are: that Rust does not come into Equity with clean hands; that the Chancellor's findings are contrary to the manifest weight of the evidence; that he erred in refusing to admit certain evidence offered by plaintiff; that he erred in refusing to charge ¼th of Troop's allowed management fee to Rust; and that he improperly applied the doctrine of confusion of goods in treating the total production from both leases as if all of it came from this lease, thereby assigning ¼th of the total to Rust. To consider these several alleged errors requires a review of the evidence.

Rust testified that, after Troop had taken over the management of this lease, there had been a reduction in the amount of oil produced from this lease while there had been a large increase on the lease to the south. Rust had filed a previous suit against Troop charging mismanagement and other faults. This was prior to 1951. The present suit concerned the years 1951 to 1956. The court refused to admit into evidence the files and correspondence pertaining to the former suit, as not being relevant to the issues in this suit. This is the ruling on exclusion of evidence to which objection is made.

In 1949 an employee of Troop made production tests of the wells on this lease. He was a witness for plaintiff and testified that the total production from this lease at that time fluctuated from a minimum of 3½ to a maximum of slightly less than 5 barrels per day. About that time Rust employed a man to make some tests of production, and his results were about the same. The prior suit was never pressed.

Vacuum was first applied to the wells on this lease in 1951. Prior to that time Troop had retained an expert to make a study of this lease and his lease to the

147

south. Troop called him as an expert witness in this case, and he testified as to his findings prior to 1951. He estimated the available oil in place and the probable future production. He recommended the application of vacuum and estimated the probable production from this lease under vacuum at 12 to 14 barrels per day.

This witness had prepared a chart with graphs showing the monthly production from this lease and the lease to the south, for the years 1941 to 1955 inclusive. The figures used as a basis were obtained from the companies which purchased the oil from the two leases (different companies). These graphs show production from this lease only slightly less than that from the adjoining lease to the south from 1941 to September of 1946. The figures in that month were 214 and 231 respectively. The difference is about 8 per cent. Troop acquired his interest in and took over the management of this lease in 1947. He acquired the other lease in the previous year. After 1946, the graphs show a continued decline in production from this lease and a very pronounced rise from Troop's adjoining lease. In September of 1947 the production from Troop's lease is shown to be ten times that of this lease. After vacuum had been applied on this lease in 1951, the graph shows a continued decline with various ups and downs, and at the end, in 1955, the south lease is shown producing twelve times as much as this lease, and it had been up to almost 20 times.

An employee of Troop testified that tanks and pipes for gathering oil had been entirely replaced in 1951. A picture of the arrangement prior to that date was offered in evidence but the court ruled it was not relevant in this suit. The witness described the pipe system installed in 1951 as being three pipes laid in the same ditch. They ran from the wells on this lease to its tank. Between the wells and the tank there was

a valve and an oil pipe connecting the line from that point to a point near a heater on the south lease. He said this line was not connected to the heater until 1953 and that thereafter oil from this lease was commingled with the other on rare occasions when the weather was bad, but he then pumped an equivalent amount back through an overhead pipe to the tank on this lease. He said the original purpose of this connection was to permit operation of the two leases together if they came under one management, and the connection was made because there was freezing in severe weather, so that heating was necessary.

He testified as to the valve in question that when closed it prevented oil from this lease going into the tank thereon, and the oil would flow onto the heater on the other lease, and from there it could be sent back to storage tanks. When the valve was open the oil would flow directly into the tank on this lease and would not go onto the other lease which was at a higher elevation.

This witness admitted that in his deposition taken more than two years prior to trial, he had testified that the connection had been made in 1951, not recalling the exact date. He had also stated under oath that the commingling of oil thereafter had been continuous practically the year round, that the wells produced mixed oil and water and the oil did not settle out without the heat treatment.

The plaintiff, Troop, also gave the year of connecting the leases as 1951, and that commingling occurred off and on thereafter. He admitted that the underground system had been installed without informing Rust about it. He stated that he had kept no records of daily production from the leases, and had no reports thereof from his pumper. He said daily run tests were not possible because of the mixture of oil and water, so the total volume of liquid could be measured, but not

149

so as to show how much was oil. He had discussed with Rust the purchase of the latter's interest.

For a period of 18 months beginning in 1954 a different operator was employed by Troop. This man testified that in this entire period all the oil from this lease had been put in its own tank, none was ever diverted to the other lease, that he did not need the heater to separate the oil from water, that there was a chemical pump in the equipment, so that he had no trouble separating the oil and marketing it. He said he did not know of the underground connection from this lease to the other. He had seen a valve in the field but had never bothered with it and had not closed it in the morning of January 4, 1956. He had checked the pumps and tanks at 5 A. M. that morning and found all pumps operating and there was oil in the tank on this lease.

On that same morning, Rust and another man who happened to be a deputy sheriff went onto this lease and inspected the tank which they found empty. They testified they checked the pumps and found them in operation. Upon returning to the tank it was still empty. They looked about while still on the cat walk and saw a valve just above the ground and some distance away. They had some digging done and found the pipe system, the valve was found closed. They saw the two outlet pipes and upon digging along the line toward the near tank they found a union. This they disconnected, and a small amount of oil ran out and then stopped. Upon opening the valve, a substantial amount of oil came out in spurts as from a pump. They reconnected the pipe. With the valve open oil flowed into the tank on this lease.

Other parts of Rust's testimony were that he had been much concerned by the shrinkage in his oil while the other lease had such a large increase, but when he spoke to Troop about it, Troop would turn the conver-

150

sation to a proposal to buy him out, asking him to name a give or take price. That Troop had not billed him for expenses at first, but later sent him large bills which he had refused to pay under the conditions. The bills he received for the years 1951 to 1955 inclusive were produced. They show charges for materials, labor and management. The aggregate amount for labor in the five years was $10,781.89. According to Troop's books, the aggregate amount charged to this lease for that period was $3,483.74.

This witness also swore that he did not know of the underground system of pipes which permitted the commingling of oil from this lease with oil on the adjacent lease to the south, until the morning of January 4, 1955, when he, his attorney, and others had gone onto the lease and discovered the arrangement.

Another witness for the defendant was the accountant for the oil company which had bought the oil from this lease during the entire period. He testified to the number of barrels purchased during 1952 to 1955, and also the amounts in dollars paid or credited to the parties. These are the same production figures reflected in the graphs previously mentioned. We have used the figures to make a computation of the average daily amount of oil purchased during each of the four years for which complete data is furnished, with the following results in round numbers: 1952, 3 barrels per day; 1953, 2 and ⅔rds per day; 1954, 1 and ½ per day; 1955, again at 3 barrels per day.

In 1956 a receiver was appointed to operate this lease and he did so for about 8 months. He testified that he made careful tests of the production and found it was a minimum of 4 and ½ barrels per day. He did not mention any difficulty with oil and water. The receivership was terminated when all the leases in the 40 acres that included this lease, were unitized and put on secondary production.

151

The foregoing we deem sufficient to present the more important parts of the testimony pertaining to the assigned errors. Of course, it is far from complete; the abstract in this case runs to more than 300 pages, and appellee filed a supplemental abstract to show more fully the contents of ledger sheets from Troop's accounting system.

The basis for the argument that Rust did not come into Equity with clean hands, is the claim that he had not cooperated with the plaintiff. The argument is that Rust was receiving his share of the production but not paying his share of the expense. It is also said that Rust refused to approve any proposals made by Troop and was making false charges against him. The bulk of the argument is an attempt to show that Troop was acting properly and that Rust's suspicions and charges were groundless. There is also a lengthy quotation from Rust's previous complaint filed in 1949, which alleged there was an improper arrangement of pipes by which oil from this lease could be diverted to the lease on the south, and alleged that it had been wrongfully used to commingle the oil. Reference is also made to the correspondence that plaintiff offered concerning this suit. None of these documents was admitted in evidence. Therefore we make no comment thereon at this point.

It is our opinion that the Chancellor could properly find from the evidence that Rust was suspicious of the actions of Troop and his bills for expenses, which Troop refused to itemize as the previous manager had done, and which clearly were false and excessive in fact. The evidence would further support a finding that Rust's suspicions were well founded, that he had a right to contest these bills in court before paying them, and he had a right to a court hearing on his charges of diversion and commingling of oil, and that there is so much evidence in his favor, that

152

his so-called refusal to co-operate was justified and does not bar him from a hearing in chancery.

The next point is whether the findings are contrary to the manifest weight of the evidence. So far as the diversion and commingling of oil is concerned, it is proved beyond a doubt. In fact it is admitted; the man who installed the underground system and continued to do the operating for some years, stated that the oil was mixed, and that it could not thereafter be distinguished and separated. Troop admitted that he knew this was being done off and on. Both assert some necessity for it, because of the water. It is clear that Troop considered the process proper and in the scope of employment of the pump man. Therefore the employee's admissions are competent evidence, and this employee admitted in his deposition that this process went on all the time, continuous practically the year round.

██ The next question is whether Rust consented to this process. We regard the evidence as sufficient to support a finding that he did not consent. Counsel again refer to the complaint in the prior suit filed in 1949 with its reference to a pipe system, and argue that this shows Rust's knowledge and consent. The argument has no merit. The prior complaint referred to a system above ground in plain sight, and which was removed in 1951. That first complaint could not possibly evidence knowledge of a system which did not then exist, and was not installed until two years later. Since Troop first took over the management, coupled with a subsequent drop in production on this lease, Rust has suspected diversion of oil. He has protested about the drop in oil production and has twice filed litigation protesting the routing of oil from this lease to the other. This court cannot hold that his protests and litigation against a process must be taken

153

by the trial court as evidence that he consented to the process.

■ ■ Whether this process was used practically all the time, as one of plaintiff's employees admitted, or never, as a second employee testified, or off and on as plaintiff himself testified, is a matter this court cannot settle. It is bound up with the credibility of witnesses, which is a question for the trier of fact.

The tests made by the first employee show that the liquid from this lease which he pumped to the heater on the other lease consisted of a mixture of oil and water with the proportions varying from day to day. He had no way of judging the proportion of oil. The same is true of the liquid from the other lease. The two streams were commingled at the heater and then went into the tanks on the south lease. When he states that he then pumped oil back to this lease through an overhead pipe, it is obvious that the quantity he may have returned could not possibly be based on anything more than guess and conjecture. This is strong evidence in support of the finding of the equities in favor of the counterclaim.

Since Troop's expert had predicted the production on this lease would be more than doubled by the use of vacuum, it seems a reasonably prudent manager would, after the installation of vacuum, make periodic, or at least sporadic tests of daily production and record them for use as a guide to correct proportions. Troop could not produce any records at all. This is additional evidence to support the charge of improper management.

■ How much of the oil from this lease was removed and never returned or accounted for, cannot be determined, as the chancellor found. Reference is here made to the only production tests in evidence, and these were before and after the period in controversy.

154

Those before showed daily production from 3 and ½ to 5 barrels daily, with the average a little under 4. It is plain that the operator who made those tests made no use of them in judging how much oil to return to this lease. The oil sold to the purchasing company did not even come up to the minimum of the tests, as shown by the daily averages. The tests made by the receiver shortly after the end of this period, showed a daily average of 4 and ½ barrels. Vacuum had been in use for the preceding 4 or 5 years. There is no attempt by counsel to explain why the lease should produce 4.5 barrels a day in 1956, but received credit for the equivalent of 3 barrels a day in 1955, and only 1 and ½ the year before that. Upon the whole of the evidence this court concludes and so finds that there is sufficient evidence to support the findings in the decree, including the finding that the counter-defendant did intentionally and tortiously mix, commingle and confuse the oil from the two leases.

■ We also hold that it was within the discretion of the trial court to refuse to admit evidence concerning a prior lawsuit and correspondence therein, and a picture of conditions at that time, which did not exist at the time of this suit nor the period involved therein.

■ The doctrine of confusion of goods has been a part of English and American law for continuous centuries. It applies to any type of goods of such uniformity that, after mixing, there is no possibility of identification of the component parts. If the proportionate parts are not ascertainable, equity will declare the innocent party owner of the whole. 11 Am. Jur. 529. Beach v. Schmultz, 20 Ill. 186; First Nat. Bank of Elgin v. Schween, 127 Ill. 573, 580; Diversey v. Johnson, 93 Ill. 547, 570.

■ These cases hold that when the commingling is proved, the burden of going forward with evidence

155

to show the correct proportions is on the party who commingled. In the absence of such proof he bears the whole loss.

■ This appears to be the first case in a court of review in this state, involving the doctrine as applied to oil. We hold that oil is a type of uniform substance to which the doctrine applies. It has been so applied in other states. We cite only one of these cases, which bears some resemblance to this case. Stone v. Marshall Oil Co., 208 Pa. 85, 57 A. 183. In that case the plaintiff owned a one fourth of the gas on one lease, which the defendant had commingled with the gas from 18 other wells. The master applied the doctrine in question and, of the net proceeds, awarded one fourth of the total to plaintiff. The trial court sustained exceptions, and required a computation, with the limitation that all doubts be resolved in favor of plaintiff. This rule was reversed by the court of review, which held the master was correct, that plaintiff should have his fraction of the entire amount.

■ We conclude that the decree properly awarded one fourth of the commingled oil to Rust, less the expenses properly charged; and the refusal to charge Rust with management fees was justified in view of the type of management he had received. The decree is affirmed in all respects.

Decree affirmed.

CULBERTSON and HOFFMAN, JJ., concur.