JEROLD EDWARDS, Plaintiff-Appellee, v. ALTON AND SOUTHERN RAILWAY COMPANY, Defendant-Appellant.

Fifth District    No. 5—94—0304

Opinion filed October 3, 1995.

Thomas E. Jones and Leslie G. Offergeld, both of Walker & Williams, of Belleville, for appellant.

Bruce N. Cook, of Cook, Shevlin, Ysursa, Brauer & Bartholomew, of Belleville, for appellee.

PRESIDING JUSTICE MAAG delivered the opinion of the court:

The defendant, Alton & Southern Railway Company, appeals from a judgment in favor of the plaintiff, Jerold Edwards, in an action brought by the plaintiff under the Boiler Inspection Act (45 U.S.C.A. § 23 (West 1986)), for neck and back injuries allegedly sustained while working as a machinist. The circuit court of Madison County entered judgment on the jury verdict awarding the plaintiff $1,454,000. The defendant appeals. We affirm.

This action arose from an injury the plaintiff suffered during the course of his employment as a machinist for the defendant. Plaintiff's job was to inspect locomotives at the "pit," which is that portion of the E track, the service and inspection track, that is alongside the "roundhouse." Generally speaking, inspections, fueling, sanding, and small repairs are done on locomotives at the pit. Major repairs to the locomotives are performed inside the roundhouse.

On the day of the accident, July 15, 1988, the plaintiff was splitting a four-engine group into a two-engine group. The first and third units were to be coupled together, as were the second and fourth units. This job is ordinarily performed by a machinist. Before the engines were separated, the plaintiff performed his inspection. When an inspection is made by a machinist, he walks around the locomotive to look for anything that might be wrong. It is mandatory that the track upon which the equipment is located be locked out or "blue-flagged" if the machinist determines that it is necessary to work on a piece of equipment.

The plaintiff did not know if the locomotives had been checked for fuel and sand before the accident. It is the hostler helper's job to check for sand and fuel and, if necessary, fill them up. It is important to note that the plaintiff testified that they only fuel and sand engines if they need it. The plaintiff also testified that at the time of his accident, the inspection was complete and the engines were ready to go. The plaintiff's testimony in this regard was uncontradicted.

The plaintiff testified that at the time of the accident, he had completed his inspection, and the track was not blue-flagged. The third and fourth units were separated from the first and second units and driven from E track to F track. While units three and four were being driven to F track, the plaintiff noticed that the drawbar on the second unit, locomotive 3347, was misaligned. The plaintiff had not noticed this during his inspection of the locomotives, and he did not know the reason that the drawbar came out of alignment. Due to the fact that the misaligned drawbar might cause a problem in coupling unit four with unit two, the plaintiff attempted to move the drawbar. The plaintiff placed one foot inside the rail and the other foot outside the rail and pushed on the drawbar. It did not move. The plaintiff pushed harder the second time, and it "took off" and moved beyond the center. When the drawbar moved, the plaintiff's body twisted around and he fell, hitting his hand and shoulders on the rail. The plaintiff was able to get up and push the drawbar back to the center. The drawbar was then able to move freely. The plaintiff waited for the hostler to bring unit four back to hook up with unit two. The plaintiff then made the necessary connections between units two and four. There were no witnesses to the accident.

When the plaintiff returned from lunch at approximately 12:20 p.m., he still needed to disconnect unit two from unit one, and connect units one and three together. The plaintiff testified that he could not remember what he did between 12:20 p.m. and 1 p.m. At 1 p.m., the plaintiff filled out an accident report with foreman Gary Stephens and listed 11 a.m. as the time of the accident. The plaintiff also testified that his accident occurred at 11 a.m. At approximately 1:30 p.m., Stephens performed an inspection of the locomotive, including the drawbar that the plaintiff reported had previously stuck. Stephens testified that he did not discover any defects during his inspection; however, if a drawbar can be moved back to center, even if it sticks or is hard to manually push, it is not required that it be reported as defective. In fact, Stephens stated that an actual defect would include a crack in the drawbar, a broken pin, a worn bushing, or anything that might be missing from the equipment. Stephens testified that if he needed to push a drawbar while on E track, he would "get good footing," attempt to make a positive lift, and move it over. If that did not work, he would get a forklift or some other type of equipment.

Dennis Korando, locomotive foreman, testified that if one is initially unsuccessful in attempting to lift and move a drawbar, he would either need to use a long bar alongside the drawbar and again try to move it, or use a forklift with a chain. Korando also testified that if a drawbar sticks, something is wrong with it.

Floyd Cooper, superintendent of defendant's transportation department, stated that if a drawbar cannot be moved with reasonable force, one should obtain assistance.

The plaintiff testified that he had received a manual of safety rules on July 1, 1986. Plaintiff stated, however, that he did not use unreasonable force when he pushed the drawbar the second time. He also claimed that he did not injure himself by lifting beyond normal capacity or by applying too much force.

After the plaintiff filled out an accident report, Cooper took him to see Dr. Cynthia Byler at the Granite City Industrial Clinic. Dr. Byler stated that the plaintiff told her that he was pushing a drawbar and felt a sharp pain in the left neck area. Plaintiff apparently told Dr. Byler that he did not fall and he was able to continue working, but the pain had radiated into his left shoulder area. Dr. Byler testified that the plaintiff had a full range of motion of the left upper extremity. He had muscle spasm in "both the left paraspinal muscles in the cervical region and also in the left trapezius." The plaintiff's range of motion was restricted for rotation of cervical spine motion on both the left and right sides. Dr. Byler's diagnosis of the plaintiff's

condition was a cervical strain. She prescribed a muscle relaxant and an anti-inflammatory agent and recommended that the plaintiff go to physical therapy three times a week for one week. The plaintiff had a 10-pound lifting limit and was to return on July 22, 1988, for a follow-up examination. Dr. Byler stated that depending on the degree of severity of the injury, the general recovery period for a cervical strain is four to eight weeks. Three days later, on July 18, 1988, the plaintiff returned for a follow-up examination. The plaintiff had undergone his first physical therapy treatment that morning and stated that his neck felt better, but his left shoulder was still sore. He also complained that the medication was making him nervous and causing him to experience blurred vision. He also told Dr. Byler about a bulge in the left groin area, and she referred him to Dr. Mayda for that particular problem. Dr. Byler's diagnosis was resolving cervical strain. She recommended that the plaintiff continue light duty and physical therapy, stop the medication, and return for a follow-up examination on July 22, 1988. Dr. Byler's final examination of the plaintiff was on July 22, 1988. Dr. Byler stated that the range was the same as it was on July 18 and improved from the examination on July 15. Plaintiff was experiencing muscle spasm and had tenderness in the left trapezius area with a complaint of pain down to the left mid-deltoid, or the mid-portion of the upper arm. Dr. Byler's treatment plan was that the plaintiff should continue light duty and take Flexeril at bedtime. Plaintiff was given a prescription for Tylenol III to take as needed for pain every four to six hours, and he was to continue physical therapy.

Dr. Mayda diagnosed the plaintiff with a hernia on August 1, 1988, and repaired it. Plaintiff testified that he has experienced no further problems from the hernia.

Prior to the accident, the plaintiff began treatment with Dr. Warren A. Stewart, Jr., a chiropractor. The plaintiff's initial visit to Dr. Stewart was on June 10, 1988. The plaintiff told Dr. Stewart that for approximately two years he had experienced pain in the left side of his neck, shoulder, and lower back, headaches, and numbness in the left and right feet. Dr. Stewart performed an orthopedic and neurological examination on the plaintiff on June 10, 1988. The tests revealed that the plaintiff had a positive Spurling's test. In this examination, the chiropractor applies pressure directed downward to the top of the skull. If the patient experiences spasms of the musculature and indicates that it hurts, the Spurling's test is positive. The test indicated that the plaintiff was experiencing an underlying problem in the side of his neck. Dr. Stewart stated, however, that he "did not feel that the patient was in a terrible situ-

ation." Dr. Stewart's examination also revealed a positive Soto-Hall test. This test is performed by having the patient lie flat on his back. The doctor applies pressure while raising the patient's head in an upward position. If the patient experiences pain, the test is positive. This test indicates anything from spinal lesions to strain of the musculature or the ligaments and can even indicate a disc problem in the neck. Plaintiff also had a positive Adson's test on the left side. This test indicated that the plaintiff was experiencing an underlying problem between the bottom of the neck and the top of the back. Dr. Stewart also performed a cervical range-of-motion examination. He discovered that the plaintiff experienced pain and restricted range of motion of the neck in every direction "[e]xcept for the left rotation." Dr. Stewart stated that the plaintiff "had pretty good range of motion for a man of his age and body type," and that he believed the plaintiff's pain was "slight." X rays of the plaintiff's neck showed an abnormal lordotic curvature. Dr. Stewart believed that the problem could be corrected by changing the plaintiff's postural habits and by the plaintiff doing exercises to loosen or tighten certain muscles in order to bring the neck back into its proper position. Dr. Stewart's diagnosis was cervical myofascitis or inflammation of the neck muscles; cervical-brachial neuralgia, neck, shoulder, and arm pain; multiple cervical subluxation, meaning that a number of areas appeared to be out of alignment; and injuries to cervical nerves C5 through C7. Dr. Stewart saw the plaintiff a total of nine times. The last time he saw the plaintiff was July 14, 1988. Dr. Stewart did not believe that the plaintiff suffered from a cervical disc injury while he was treating the plaintiff. Dr. Stewart testified that the plaintiff's symptoms and pain were not as severe as one would experience with a disc injury.

Dr. George R. Schoedinger III, an orthopedic surgeon, testified that he first examined the plaintiff on August 16, 1988. Plaintiff told Dr. Schoedinger that he was injured on July 15, 1988, while moving a coupler on an engine. Dr. Schoedinger stated that plaintiff told him that his feet slipped as he moved the coupler and that he caught himself with his left hand. The plaintiff reported that he experienced immediate severe pain in the back and left side of his neck with shoulder pain developing thereafter. On August 16, 1988, plaintiff stated that he was experiencing pain in his neck and the upper portion of his left shoulder, pain radiating into the left arm, and pain or sensory loss involving the fourth and fifth fingers on the left hand. Dr. Schoedinger's examination of the plaintiff was normal except for decreased sensation over the left radial nerve distribution, which is in the hand. Dr. Schoedinger obtained X rays, and they revealed nothing out of the ordinary. Based upon his examination of the

plaintiff, Dr. Schoedinger determined that the plaintiff's symptoms suggested the presence of a cervical disc rupture. A CAT scan and an MRI performed on August 31, 1988, revealed the presence of disc ruptures between the fifth and sixth vertebrae and the sixth and seventh vertebrae. On September 8, 1988, Dr. Schoedinger spoke with the plaintiff by telephone and told him that when he could no longer live with the problem, he should consider surgical treatment. Dr. Schoedinger opined that both disc ruptures were caused by the accident that occurred on July 15, 1988.

On November 18, 1988, plaintiff informed Dr. Schoedinger by telephone that "something needed to be done about his problem." On December 8, 1988, the plaintiff was admitted to the hospital for surgery. On December 9, 1988, Dr. Schoedinger removed two of the plaintiff's cervical discs. He then drilled holes spanning the disc spaces and inserted plugs of bone in order for the area to become solid. The plaintiff was discharged from the hospital on December 10, 1988, and asked to come back for a follow-up examination in one month.

The plaintiff's first follow-up visit was on February 1, 1989. The plaintiff was not working but was experiencing pain in the back of his neck and between the shoulders. Plaintiff had no arm complaints and his examination was normal. Plaintiff returned for several follow-up appointments and complained about pain and stiffness in his neck and shoulders and numbness in his left hand.

The plaintiff returned for an examination with Dr. Schoedinger on April 12, 1993. He complained that he had developed ringing in his ears and was experiencing headaches and neck pains with increasing severity. The remainder of the examination was normal except for his neck range of motion, which was consistent with having had a fusion. Dr. Schoedinger recommended that plaintiff have another MRI. The MRI revealed a solid fusion and scarring in the area of the surgery. Dr. Schoedinger told the plaintiff that further treatment would not be beneficial. He told the plaintiff to return as needed.

Dr. Schoedinger opined that the plaintiff would continue to have neck pain intermittently and "a permanent alteration of the architecture of his spine." Dr. Schoedinger testified that because of this alteration the plaintiff will not be able to use his neck as a person with a normal cervical spine. Dr. Schoedinger stated that he did not believe that the plaintiff would require further surgery, narcotics, or ongoing medical care. Dr. Schoedinger testified that in his opinion, the plaintiff would not be able to return to his position as a machinist for the railroad. Although Dr. Schoedinger stated that he would give plaintiff a release if he requested one, he said that the plaintiff

was more susceptible to further injury of the neck and that his condition was permanent and, to a degree, progressive. Dr. Schoedinger stated: "I am not in the position of being a policeman. I am his physician and telling him what I think."

Defendant's counsel requested that the plaintiff see Dr. Patrick A. Hogan, a neurologist, on May 19, 1992. Dr. Hogan reviewed Dr. Schoedinger's and Dr. Stewart's medical records and the hospital records that, in detail, recorded plaintiff's surgical procedure and diagnostic studies. Based upon a review of medical reports, X-ray films, and his examination of the plaintiff, Dr. Hogan believed that the plaintiff would be able to perform a machinist's job duties. Dr. Hogan did not believe that the plaintiff would require future medical care or treatment. Although Dr. Hogan admitted that he had not personally examined the plaintiff until May 19, 1992, it was his opinion, from reviewing the plaintiff's medical records, that the disc rupture that Dr. Schoedinger operated on preexisted the plaintiff's accident.

Evelyn Pulley, defendant's superintendent of safety and claims, testified that in the month prior to the plaintiff's injury he took three days off out of a possible total of 34 days. She admitted, however, that prior to the accident on July 15, 1988, the plaintiff did not have the work record of a man with a ruptured disc. The plaintiff had not taken any sick days in 1988. Defendant's file on the plaintiff indicated that he was off work "from an accident on 7-15-88."

The defendant had filled out a form for the plaintiff's mortgage insurance company stating that the plaintiff was disabled from an accident that occurred when the plaintiff was moving a coupler on a diesel engine. Furthermore, the plaintiff's personnel file stated that he had been off work since July 15, 1988, "from a personal injury on duty."

Plaintiff's second amended complaint was pleaded in four counts. The defendant moved for a directed verdict on the Boiler Inspection Act count (count IV), contending that it did not apply to the facts of this case. The trial court denied defendant's motion. On plaintiff's motion, the trial court directed a verdict in plaintiff's favor on the issue of liability on the Boiler Inspection Act count. Plaintiff then submitted the case to the jury only on count IV.

Because of the directed verdict in favor of the plaintiff, the jury received only one verdict form. The completed form was filled in by the jury as follows:

> "We, the Jury, find for the plaintiff and assess damages as follows:
> Disability and disfigurement.............$ 150,000

> Past & future pain and suffering..........$ 250,000
> Past & future lost wages.......................$1,036,000
> Medical expenses.........................................$ 18,000."

The defendant claims that the circuit court erred in directing a verdict on the Boiler Inspection Act count. It claims that at the time of the accident the locomotive was not "in use" within the meaning of the Act. The Boiler Inspection Act states as follows:

> **"§ 23. Use of unsafe locomotives and appurtenances unlawful; inspection and tests**
>
> It shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender, and all parts and appurtenances thereof have been inspected from time to time in accordance with the provisions of sections 22 to 29 and 31 to 34 of this title and are able to withstand such test or tests as may be prescribed in the rules and regulations hereinafter provided for." 45 U.S.C.A. § 23 (West 1986).

The defendant cites *Pinkham v. Maine Central R.R. Co.* (1st Cir. 1989), 874 F.2d 875, 881, and *Angell v. Chesapeake & Ohio Ry. Co.* (4th Cir. 1980), 618 F.2d 260, 262, for the proposition that locomotives being inspected, serviced, or repaired in a maintenance facility are not "in use" within the meaning of the Act. The defendant contends that it was undisputed that the "locomotive's fuel and sand levels had to be checked before it could leave the pit" and, therefore, the locomotive was not "in use." We have searched the record in vain for evidence that the fuel and sand levels still needed to be checked when the plaintiff's accident occurred. The defendant claims that it was plaintiff's burden to produce *prima facie* evidence that all servicing, maintenance, and inspection work had been performed on the locomotive before his accident and that he failed to do so.

Plaintiff testified that his walk-around inspection was complete and the couplers had been split. Plaintiff stated that as soon as the engines were hooked together, they were ready for the crew. The evidence was undisputed that when machinists are working on a piece of equipment, the track must be "blue-flagged and locked out," and that the track that the plaintiff was working on "was a live track." In fact, the plaintiff testified that the track on which he was working at the time of his accident was not blue-flagged.

We believe that the facts in this case are similar to, but much stronger than, the facts in *Angell*, 618 F.2d at 260. In *Angell*, a

machinist was injured when a blast of high-pressure air from a defective brake valve injured his right ear while he was assisting in switching diesel engines at the railway facilities. The engine was transferred to the mechanical department for sand, fuel, and routine inspection. The engine was placed on a service track, which was then "blue-flagged." The engine was sanded and fueled, and Angell then assisted the hostler in moving the engine to a nearby track where they could form part of a "consist," a number of engines, to pull a train later that evening. The injury occurred while two engines were being uncoupled. In *Angell*, the defendant railroad argued that Angell's accident occurred outside the scope of the Boiler Inspection Act because it was not "in use" on the line of the railroad at the time of the accident. Although the *Angell* court acknowledged that the defendant had cited several cases where an employee, injured while performing service or repair functions on a locomotive, was denied coverage under the Boiler Inspection Act (*Tisneros v. Chicago & Northwestern Ry. Co.* (7th Cir. 1952), 197 F.2d 466; *Lyle v. Atchison, Topeka & Santa Fe Ry. Co.* (7th Cir. 1949), 177 F.2d 221; *Simpkins v. Baltimore & Ohio R.R. Co.* (S.D. Ohio 1976), 449 F. Supp. 613), the court stated that those cases were distinguishable from *Angell* because in *Angell* all servicing, maintenance, and inspection work had already been performed and the engine was being moved to its place in the consist.

■ The testimony in the instant case is uncontradicted that the walk-around inspection was complete, the track was not blue-flagged, and the consist was ready for the Union Pacific crew. As soon as the engines were hooked together, they were ready to go. We find it hard to comprehend exactly how the plaintiff would prove that the locomotives did not need to be fueled and sanded. This information is not within the plaintiff's control. We believe that after the plaintiff's uncontradicted testimony that the engines were ready for the Union Pacific crew, the burden shifted to the defendant to show that the plaintiff's testimony was incorrect. Because the defendant did not provide such evidence, if it existed, this court cannot find that the locomotives still needed to be serviced. Moreover, Stephens, the locomotive shop foreman, testified that certain locomotives must be fueled and sanded before they leave the inspection area. He stated, however, that the locomotive on which the plaintiff was injured was not one of the locomotives that must be fueled and sanded before leaving the inspection area. Therefore, even if locomotive 3347 had not been sanded and fueled at the time of the plaintiff's accident, there is absolutely no evidence that it necessarily would have been sanded and fueled before its departure.

Finally, the defendant argues that it was error to allow the

plaintiff at trial to read to the jury portions of Fred Norris' *discovery* deposition.

Supreme Court Rule 212(a)(2) (134 Ill. 2d R. 212(a)(2)) states as follows:

> "(a) **Purposes for Which Discovery Depositions May Be Used**. Discovery depositions taken under the provisions of this rule may be used only:
>
> \*\*\*
>
> > (2) as an admission made by a party or by an officer or agent of a party in the same manner and to the same extent as any other admission made by that person."

An agent may make an admission regarding a matter within the scope of his authority while the employment relationship exists. (*Miller v. J.M. Jones Co.* (1992), 225 Ill. App. 3d 799, 803, 587 N.E.2d 654, 658.) While it is obvious that agents or employees are seldom given specific authority to make statements that are damaging to their principal, such statements will be admitted if they concern matters within the scope of the agent's or employee's employment. (*Miller*, 225 Ill. App. 3d at 803, 587 N.E.2d at 658.) Although we recognize that the strict view requires authority to make the statement, this is contrary to the present trend in the direction of admitting the statement of the agent if made concerning matters within the scope of his employment. (See M. Graham, *Cleary & Graham's Handbook of Illinois Evidence* § 802.9, at 685-86 (6th ed. 1994); *Miller*, 225 Ill. App. 3d at 803, 587 N.E.2d at 658.) We believe that this is the broader and better view. See also *Troop v. St. Louis Union Trust Co.* (1960), 25 Ill. App. 2d 143, 166 N.E.2d 116 (proper to admit statement of pumpman as to manner of pumping oil); *Ogg v. City of Springfield* (1984), 121 Ill. App. 3d 25, 458 N.E.2d 1331 (deposition of employee pertaining to his duties is admissible).

In summary, Fred Norris' discovery deposition states that he was employed by the defendant as a switchman. In 1986, he was injured while moving a frozen drawbar when it suddenly "gave way." He was off work for approximately 45 days. Knowledge regarding the operation of drawbars is a matter within the scope of a railroad switchman's employment. Because Norris' deposition concerns a matter within the scope of his employment, we fail to see why his statement would not be considered an admission, sufficient to impute knowledge to the defendant of the dangers associated with drawbars that stick. (See 134 Ill. 2d R. 212(a)(2); *Troop*, 25 Ill. App. 2d 143, 166 N.E.2d 116; *Ogg*, 121 Ill. App. 3d 25, 458 N.E.2d 1331.) We find no error in allowing the use of the discovery deposition under the circumstances.

■ In any event, the evidence was at most cumulative. In the case

at bar, Pulley testified that 21 people, not including Norris, had been injured pushing drawbars prior to the plaintiff's accident. Because Norris' discovery deposition merely showed that he had been injured while pushing a frozen drawbar, we fail to see how defendant was prejudiced. Hence, if any error occurred, it was harmless.

Accordingly, we affirm the trial court's judgment in all respects except for the interest that has accrued on Dr. Schoedinger's medical bills. Therefore, we reduce the plaintiff's judgment in the amount of $7,394.95.

Affirmed as modified.

GOLDENHERSH and RARICK, JJ., concur.