No. 96-2286

Basin Electric Power           *
Cooperative; The Coteau        *
Properties Company; Dakota     *
Coal Company,                  *
                               *   Appeal from the United States
          Appellees,           *   District Court for the
                               *   District of North Dakota.
     v.                        *
                               *
ANR Western Coal Development   *
Company,                       *
                               *
          Appellant.           *


                    Submitted: December 9, 1996

                        Filed: January 28, 1997


Before BOWMAN and LAY, Circuit Judges, and SMITH,[1] District Judge.


BOWMAN, Circuit Judge.


     ANR Western Coal Development Company (WCDC) appeals from the District
Court's declaratory judgment in favor of plaintiffs Basin Electric Power
Cooperative (Basin), The Coteau Properties Company (Coteau), and Dakota
Coal Company (Dakota) in this action involving accounting procedures for
coal royalties.  We reverse and remand.

---

[1]The Honorable Ortrie D. Smith, United States District Judge
for the Western District of Missouri, sitting by designation.

Numerous agreements among the parties and non-parties govern the movement of the coal and the royalty payments involved in this case. A careful examination of the record reveals the following essential facts.

In a 1979 contract between WCDC and the parent company of Coteau, WCDC agreed to fund the acquisition of coal reserves near Beulah, North Dakota. In return, WCDC was entitled to receive an overriding royalty of forty cents per ton of coal, adjusted for inflation, from the company that mined the coal (eventually Coteau). This situation was modified somewhat in a 1987 agreement among WCDC, Coteau, and the predecessor of Dakota, among others. In the 1987 agreement, Dakota's predecessor assumed from WCDC the responsibility for funding further acquisitions of coal reserves, and WCDC's royalty was limited to coal reserves acquired by Coteau before March 2, 1987. Since 1987, Dakota has funded the acquisition of new reserves, and the mine near Beulah, known generally as the Freedom Mine, now contains some coal on which WCDC is entitled to a royalty (royalty coal) and some coal on which WCDC is not entitled to a royalty (non-royalty coal).

Coteau records the amount of royalty coal and non-royalty coal extracted from the Freedom Mine and then commingles the coal in its handling facilities. When the coal is commingled, royalty coal is indistinguishable from non-royalty coal. Coteau sells the coal to Dakota, a wholly-owned subsidiary of Basin. Dakota then supplies the coal to four end users: Basin's Antelope Valley Station (AVS), Basin's Leland Olds Station, United Power Association's Stanton Plant, and the Great Plains Synfuels Plant, which is owned and

operated by an affiliate of Dakota.[2]  Royalties flow from the end users through Coteau to WCDC.

The process is complicated by one additional agreement.  In 1982, Basin paid WCDC $40 million to satisfy WCDC's overriding royalty on "the amount of coal which is mined from the reserves dedicated to the [1979] Agreement and which is delivered to Basin Electric for the Antelope Valley Station," subject to an annual cap of 5.2 million tons and a total cap of 210 million tons.  Purchase Agreement ¶ 2, Appellant's App. at 188, 191.  In effect, the 1982 agreement relieves Basin of the obligation to pay the forty-cent royalty (as adjusted for inflation) on royalty coal delivered to the AVS, except to the extent that deliveries of royalty coal exceed the annual or total limits.  The $40 million price is not to be "adjusted upwards or downwards in the event that coal ultimately delivered to Basin Electric . . . is in excess of or is less than the maximum" 210 million tons.  Id. ¶ 1.[3]

---

[2]The Great Plains plant, which converts coal into synthetic gas, has been the subject of considerable litigation before this Court and the district courts of North Dakota.  See Dakota Gasification Co. v. Pascoe Bldg. Sys., 91 F.3d 1094 (8th Cir. 1996); Dakota Gasification Co. v. Natural Gas Pipeline Co., 964 F.2d 732 (8th Cir. 1992), cert. denied, 506 U.S. 1048 (1993); United States v. Great Plains Gasification Assocs., 819 F.2d 831 (8th Cir. 1987); United States v. Great Plains Gasification Assocs., 813 F.2d 193 (8th Cir.), cert. denied, 484 U.S. 924 (1987).

[3]The parties have characterized the 1982 agreement in rather different fashions.  WCDC asserts that Basin purchased from WCDC the right to receive the royalty, while the plaintiffs describe the $40 million as a prepayment of the royalty.  We will use the term "prepayment" because it is a fair description of what happened in 1982, but we disagree with Basin's implication that the "prepayment" entitles Basin to receive 210 million tons of royalty coal.  Paragraph 1 of the agreement places squarely on Basin the risk that the AVS may not receive a full 210 million tons of royalty coal to be credited against the "prepayment."

In light of the foregoing facts, the nature of the present dispute becomes somewhat more evident. Because Coteau commingles royalty coal and non-royalty coal, and because some of the commingled coal winds up at the AVS, the parties must have a procedure to determine how much royalty coal is attributable to the AVS and therefore free from further royalty payments. Coteau, backed by the other plaintiffs, implemented an accounting method that deems all royalty coal in the mixture to be delivered to the AVS, subject to the 5.2 million ton annual limit (the deeming method). WCDC, on the other hand, argues that the doctrine of "confusion of goods" applies and that the royalty coal should be traced proportionally from Coteau to Dakota to each of the four end users (the pro rata method).

An example from a deposition in this case (with numbers rounded slightly) provides a useful illustration of exactly what the parties are disputing. In August 1992, Coteau sold and delivered to Dakota 1,221,000 tons of coal, of which 863,000 tons (71%) were royalty coal and 358,000 tons (29%) were non-royalty coal. Dakota delivered 456,000 tons of the commingled coal to the AVS. After the inflation adjustment, WCDC's royalty was 73 cents per ton. The deeming method directs royalty coal to the AVS first; as a result, all 456,000 tons delivered to the AVS would be considered royalty coal. Because Basin prepaid the royalty on coal delivered to the AVS, WCDC would receive a royalty only on the 407,000 tons of royalty coal delivered to the other end users, for a total royalty payment of $297,000. Under the pro rata method, 71% of the coal delivered to each end user would be considered royalty coal; accordingly, only 324,000 tons of the coal delivered to the AVS would be considered royalty coal. WCDC would thus be entitled to a royalty on the other 539,000 tons of royalty coal,

for a total royalty payment of $393,000.[4]  See Appellant's App. at 215-17.

To resolve this dispute, Basin, Coteau, and Dakota filed a declaratory judgment action in state court, seeking approval of the deeming method.  WCDC removed the action to federal court on diversity grounds and responded with six counterclaims:  (1) declaratory relief; (2) breach of contract; (3) tortious interference with contract; (4) breach of a duty of good faith and fair dealing; (5) breach of an implied covenant of reasonable development and mining; and (6) tortious interference with prospective economic advantage.

After discovery, the parties filed cross-motions for partial summary judgment.  WCDC moved for summary judgment on its first counterclaim, seeking a declaration that the confusion of goods doctrine applies and requires the pro rata accounting method.  The plaintiffs argued that disputed material facts precluded summary judgment; they did not move for summary judgment in their favor on the accounting issue.  The plaintiffs did seek summary judgment on WCDC's fourth and fifth counterclaims, arguing that they owed WCDC no duty of good faith and fair dealing or duty of reasonable development and mining.

---

[4]It is important to recognize that under neither accounting method would Basin pay anything to WCDC on account of royalty coal delivered to the AVS.  Basin favors the deeming method because it would allow Basin to recoup its $40 million prepayment more rapidly by accelerating its progress toward the 210 million ton limit in the 1982 agreement.  WCDC favors the pro rata method because the attribution of royalty coal to end users other than the AVS has the obvious cash flow advantage demonstrated in the example.  In addition, to the extent that the pro rata method delays the time at which the 210 millionth ton of royalty coal is delivered to the AVS, it requires Basin to bear the risks of the shutdown of the AVS or the depletion of the royalty coal reserves.

The District Court denied WCDC's motion for summary judgment on the accounting issue and granted the plaintiffs declaratory relief, approving the deeming method. In addition, the District Court granted the plaintiffs' motion for summary judgment on the fourth and fifth counterclaims, dismissing these claims without prejudice. A revised judgment dismissed WCDC's first, second, and third counterclaims with prejudice and its fourth, fifth, and sixth counterclaims without prejudice. After a post-judgment motion was denied, WCDC appealed. We review a decision on summary judgment de novo. See Smith v. City of Des Moines, 99 F.3d 1466, 1468-69 (8th Cir. 1996).

## II.

We begin with the dispositive issue in this appeal, the accounting issue. As WCDC has demonstrated convincingly, the doctrine of confusion of goods has been a part of the law for centuries. See 2 William Blackstone, Commentaries *405. In its strictest form, the doctrine provides that one who wrongfully intermixes his goods with the goods of another so that the goods are indistinguishable forfeits the entire mixture to the wronged party. See id.; The Idaho, 93 U.S. 575, 585-86 (1877). WCDC does not claim that the commingling of the coal in this case is in any way wrongful, nor does it seek a forfeiture of any coal. Rather, WCDC seeks to apply the more lenient form of the doctrine, which holds that each owner of goods that are intermingled "becomes the owner as tenant in common of an interest in the mass proportionate to his contribution." The Intermingled Cotton Cases, 92 U.S. 651, 653 (1876); see also 2 Blackstone at *405; W.E. Shipley, Annotation, Confusion of Goods by Accident, Mistake, or Act of a Third Person, 39 A.L.R.2d 555, 559 (1955).

Courts in a number of jurisdictions have applied the confusion of goods doctrine--in its forfeiture form or its shared-ownership form--to a wide variety of situations and goods. See, e.g., Silver

King Coalition Mines Co. v. Conkling Mining Co., 255 F. 740, 743 (8th Cir. 1919) (ore); Norris v. United States, 44 F. 735, 738-39 (C.C.W.D. La. 1891) (logs); Gilberton Contracting Co. v. Hook, 267 F. Supp. 393, 394-95 (E.D. Pa. 1967) (coal silt); Vest v. Bond Bros., 137 So. 392, 392-93 (Ala. 1931) (lumber); Buckeye Cotton Oil Co. v. Taylor, 53 S.W.2d 428, 428-29 (Ark. 1932) (cotton seed); Ramsey v. Rodenburg, 212 P. 820, 821 (Colo. 1923) (wheat); Troop v. St. Louis Union Trust Co., 166 N.E.2d 116, 122-23 (Ill. App. Ct. 1960) (oil); Hanna Iron Ore Co. v. Campbell, 29 N.W.2d 393, 401-02 (Mich. 1947) (iron ore); Swanson v. St. Paul Union Stockyards Co., 195 N.W. 453, 454-55 (Minn. 1923) (cattle); Belmont v. Umpqua Sand & Gravel, Inc., 542 P.2d 884, 891 (Or. 1975) (gravel); Stone v. Marshall Oil Co., 57 A. 183, 187-88 (Pa. 1904) (oil); Mooers v. Richardson Petroleum Co., 204 S.W.2d 606, 607-08 (Tex. 1947) (oil); Johnson v. Covey, 264 P.2d 283, 283-84 (Utah 1953) (pipe).  In a case in which royalty-bearing natural gas was mixed with non-royalty-bearing gas, the Texas Supreme Court held that if the party mixing the two sources could prove with reasonable certainty the relevant amounts of gas, the royalty owner would be entitled to a royalty on its proportional share of the commingled gas.  See Humble Oil & Refining Co. v. West, 508 S.W.2d 812, 818-19 (Tex. 1974); see also Exxon Corp. v. West, 543 S.W.2d 667, 673-74 (Tex. Civ. App. 1976) (after remand, limiting amount of royalty gas to maximum proved at trial); cert. denied, 434 U.S. 875 (1977).

WCDC suggests that North Dakota law is the appropriate rule of decision in this diversity action.  The plaintiffs do not argue otherwise, and we see no reason to disagree.  The parties have not cited, nor have we located, any controlling North Dakota case or statute.  Accordingly, our duty is to predict how the North Dakota Supreme Court would resolve the accounting issue.  See Jackson v. Anchor Packing Co., 994 F.2d 1295, 1301 (8th Cir. 1993).

We believe the cases cited above--particularly the closely analogous Humble Oil--provide strong support for the proposition

that the North Dakota courts would apply the confusion of goods doctrine in this case. Our decision is further aided by a provision of Article 9 of the Uniform Commercial Code, which North Dakota has adopted. Section 9-315(2) of the U.C.C. governs multiple security interests in goods that are commingled so that their identity is lost in a product or mass:

> When . . . more than one security interest attaches to the product or mass, they rank equally according to the ratio that the cost of the goods to which each interest originally attached bears to the cost of the total product or mass.

N.D. Cent. Code § 41-09-36(2) (1983); see also Dakota Bank & Trust Co. v. Brakke, 404 N.W.2d 438, 443-45 (N.D. 1987) (applying this section to security interest in grain commingled in grain elevator). In the circumstances of this case, a royalty interest in commingled coal is analogous to a security interest in commingled grain. We conclude that the North Dakota Supreme Court would apply the confusion of goods doctrine in this case.

There remains one logical step in the resolution of this issue. Contrary to WCDC's assertions, the confusion of goods doctrine does not of its own force require that a particular accounting method be applied in this case. Because none of the cases we have located have involved facts like those in the case at bar, other courts have not had to consider the precise issue presented here. Aside from the wrongful-mixture cases that result in forfeiture, the usual remedy in a confusion of goods case is either a proportional division of the goods, see Ramsey, 212 P. at 821, or a money judgment proportional to the plaintiff's contribution, see Buckeye Cotton Oil Co., 53 S.W.2d at 428. In this case, WCDC does not seek to recover a portion of the coal, and it is not possible to calculate how much money WCDC is owed until the correct accounting method is determined.

To make this determination, we rely on one consequence of the application of the confusion of goods doctrine: the contributors to the commingled mass are considered tenants in common in the whole. See The Intermingled Cotton Cases, 92 U.S. at 653; 2 Blackstone at *405; Shipley, 39 A.L.R.2d at 559. But cf. Vest, 137 So. at 393 (contributors considered owners of severable portions of mixture). A tenancy in common is an undivided interest in property. See Volson v. Volson, 542 N.W.2d 754, 756 (N.D. 1996); Roger A. Cunningham et al., The Law of Property § 5.2, at 190-91 & n.29 (2d ed. 1993). In this case, a tenancy in common implies that the royalty coal constitutes an undivided proportion of the commingled coal distributed by Dakota to the four end users. Because Basin and WCDC have agreed that Basin may offset against its prepayment only that royalty coal "which is delivered to Basin Electric for the Antelope Valley Station," the pro rata method is the appropriate means of accounting for WCDC's royalties. Not surprisingly, it also appears to be the method used by the coal industry, including Coteau, in other situations involving commingling of coal bearing different royalty interests. See Appellant's App. at 522, 1163-65, 1186-88.

The District Court had several objections to the application of the pro rata method in this case, and the plaintiffs have raised still others. We consider these in turn. Contrary to the District Court's suggestion, the confusion of goods doctrine is not merely a construction of oil and gas law, as the variety of the cases cited above demonstrates. Nor does the doctrine apply only when it is established by agreement of the parties. In none of the cases we have cited was the court merely enforcing a contractual provision requiring the result reached by the court.

The District Court based its decision in part on the intent of the signatories to the various agreements and on the complicated circumstances surrounding the troubled history of the Great Plains gasification plant. WCDC argues that the court, in performing this

analysis, relied on a number of facts without support in the record. See Memorandum and Order at 10-13; Appellant's App. at 569-72. WCDC also suggests that determining the intent of the parties involves the resolution of disputed questions of fact, an inappropriate endeavor at the summary judgment stage. We need not address these objections specifically, because we believe these questions of intent and the history of the gasification plant are irrelevant in any event. The confusion of goods doctrine determines the rights of the parties in the commingled coal, and the unambiguous contract between Basin and WCDC, along with a bit of basic property law and common sense, determines the appropriate method of accounting for their rights.

The plaintiffs argue, as they did below, that factual disputes preclude the entry of judgment in favor of WCDC on the accounting issue. The only disputes raised by the plaintiffs, however, are immaterial. The plaintiffs first argue that WCDC "caused" the commingling when it entered into the 1987 agreement that relieved WCDC of further responsibility for funding the acquisition of coal reserves. But it does not matter who causes the commingling--the alternative argument being that Coteau causes the commingling when it combines coal mined from different areas--because it is undisputed that Coteau knows the correct proportions of royalty coal and non-royalty coal from which to make the necessary calculations. For the same reason, the argument that some of the coal is "commingled in the ground" (a concept that WCDC says is nonsensical) is immaterial. The confusion of goods doctrine places the burden on the commingling party to identify the proportional interests of each party, see Humble Oil, 508 S.W.2d at 818, but because the proportional interests in this case are readily known, we need not be concerned with the issue of who causes the commingling.

Finally, we consider several equitable arguments pressed by the plaintiffs. Confusion of goods is an equitable doctrine, and

-10-

concepts such as unclean hands play a role in its application. See, e.g., Troop, 166 N.E.2d at 121. The District Court evidently considered the misfortunes of the gasification plant and the ensuing, probably unpredictable, effects on Basin and others as a rather amorphous equitable factor weighing in favor of allowing Basin to reap the benefits of its royalty prepayment as rapidly as possible. We disagree. In the 1982 prepayment agreement, Basin clearly took the risk that it would not receive 210 million tons of royalty coal for use at the AVS at all, much less in any particular period of time. Basin was well-compensated for this risk; assuming that Basin receives all 210 million tons, its $40 million payment translates to nineteen cents per ton, compared to the forty-cents-plus per ton that Basin would owe if it paid the royalty over time. Having taken a significant risk in exchange for a significant benefit, Basin cannot now complain that it does not like its bargain and ask a court effectively to rewrite the contract.

One other equitable factor raised by the plaintiffs merits discussion. The plaintiffs attempt to demonstrate that if the pro rata accounting method is adopted, WCDC will receive its royalty on too much coal--that is, more royalty coal than exists in reality. See Appellees' App. at 98. At first blush, this calculation, which we will not repeat in detail, is rather persuasive, for surely there is something wrong with an accounting procedure that permits WCDC to receive double royalties on some of the royalty coal. As it turns out, there is something wrong with the plaintiffs' calculation instead: they have apparently counted 210 million tons of royalty coal as belonging to Basin, and because the pro rata method recognizes that some of those 210 million tons may go to end users other than the AVS, the plaintiffs claim that WCDC will be overpaid. But, as we have now repeated several times, Basin did not purchase the right to receive 210 million tons of royalty coal at the AVS; in prepaying the royalty at a reduced rate, Basin specifically took the risk that it would receive less. WCDC will receive a royalty on account of royalty coal delivered to end users

-11-

other than the AVS, and, depending on future events, Basin may not be able to take full advantage of its royalty prepayment, but under the pro rata accounting method, WCDC will not be paid twice for any royalty coal.

## III.

We must also consider the District Court's dismissal of WCDC's other counterclaims.  Although it is not clear from the court's memorandum and opinion, the court apparently dismissed WCDC's second (breach of contract) and third (tortious interference with contract) counterclaims as moot, given the court's ruling on the accounting issue.  In light of our reversal of the District Court on that issue, the second and third counterclaims are not moot, and so we now reinstate them.

The court's treatment of WCDC's fourth (good faith and fair dealing), fifth (reasonable development and mining), and sixth (tortious interference with prospective economic advantage) counterclaims is more puzzling.  All three claims are based on WCDC's allegations that Coteau is conducting its operation of the Freedom Mine in an unreasonable manner and thereby minimizing WCDC's royalty revenue.  The fourth and fifth counterclaims were the subject of a summary judgment motion by the plaintiffs, who argued that they did not owe the duties asserted by WCDC.  The District Court, however, appeared to decide a different issue, holding that the plaintiffs had satisfied these duties.  See Memorandum and Opinion at 14 ("The court is reluctant to replace the expert opinion of mining engineers and other mining experts as is necessary to conclude that Coteau violated its implied duty of reasonable development and good faith.").  The court then dismissed these counterclaims without prejudice, although there is at least a substantial question whether they are compulsory counterclaims that could not be asserted in another action.  See Fed. R. Civ. P. 13(a).

-12-

The opinions of the "mining engineers and other mining experts" supporting the plaintiffs are not in the record on appeal. But in crediting these experts, the court clearly ignored the opinion of WCDC's expert, backed by a lengthy and detailed study, that Coteau was not mining the Freedom Mine in an economically prudent manner. See Appellant's App. at 377-79, 387-482.[5] Similarly, WCDC introduced evidence suggesting that the plaintiffs have not acted in good faith, but have instead sought to minimize WCDC's royalties. See Appellant's App. at 871-72. We are not prepared to hold as a matter of law that WCDC has introduced evidence sufficient to withstand summary judgment; in particular, we are not certain that WCDC has presented substantial evidence of a breach of the duty of good faith and fair dealing. But if WCDC has not produced enough evidence to withstand summary judgment on the question of breach, that may well be because the plaintiffs moved for summary judgment on the theory that they did not owe WCDC the duties alleged in the counterclaims. WCDC cannot be faulted for failing to introduce sufficient evidence on an issue that was not before the court. The dismissal of the fourth and fifth counterclaims must therefore be reversed. On remand, whether the plaintiffs owe WCDC any duty of good faith and fair dealing or any duty of reasonable development and mining are threshold questions that remain open for decision.

Finally, we see no reason in the District Court's opinion for the dismissal of the sixth counterclaim, except that perhaps the court considered it moot in light of the dismissal of the fourth

---

[5]WCDC acknowledges that this expert's report was not filed with the District Court before the court entered summary judgment, but notes that the plaintiffs' experts' reports had not been filed at the time either. WCDC's expert's report was before the court on WCDC's motion to alter or amend the judgment. As we explain below, we cannot fault WCDC for failing to submit the report earlier, because the report was apparently irrelevant to the issues presented by the plaintiffs' summary judgment motion.

-13-

and fifth counterclaims.  This claim, too, must be reinstated and remanded for further proceedings.

## IV.

The judgment of the District Court is reversed.  The case is remanded with instructions to enter judgment for WCDC on the plaintiffs' complaint and on WCDC's first counterclaim and to conduct such further proceedings on the remaining counterclaims as may be necessary.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.